CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Peter A. Schey (Cal. Bar No. 58232)
Carlos Holguín (Cal. Bar No. 90754)
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: pschey@centerforhumanrights.org
       crholguin@centerforhumanrights.org


BENJAMIN L. CRUMP, ESQUIRE (FL BAR NO. 72583)
PRESIDENT, NATIONAL BAR ASSOCIATION
PARKS & CRUMP, L.L.C.
240 N. Magnolia Drive
Tallahassee, FL 32301
Telephone: (850) 222-3333
Email: bcrump@parkscrump.com

*Attorneys for plaintiffs (listing continues on following page)*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MUTULU SHAKUR,<br><br>    Plaintiff,<br><br>- vs -<br><br>LOUIS MILUSNIC, WARDEN, BUREAU OF PRISONS; FEDERAL BUREAU OF PRISONS; UNITED STATES DEPARTMENT OF JUSTICE; UNITED STATES PAROLE COMMISSION, UNITED STATES DEPARTMENT OF JUSTICE<br>    Defendants. | Case No.<br><br>APPENDIX 1 TO PLAINTIFFS' PETITION FOR WRIT OF HABEAS CORPUS PUSUANT TO 28 U.S.C. § 2241 |

*Plaintiffs' counsel, continued*

MICHAEL BRENNAN (CAL. BAR NO. 40436)
HEIDI RUMMEL (CAL. BAR NO. 183331)
POST-CONVICTION JUSTICE PROJECT
USC GOULD SCHOOL OF LAW
699 Exposition Blvd.
Los Angeles, CA 90089
Telephone: 213.740.2865
Facsimile: 213.821.5746
Email: mbrennan@law.usc.edu
        hrummel@law.usc.edu

PROFESSOR LENNOX S. HINDS (NY BAR NO. 1696574)
NATIONAL CONFERENCE OF BLACK LAWYERS
75 Maiden Lane, Suite 222
New York, NY 10038
Telephone: (212) 864-4445
Email: LennoxHinds@aol.com

Of Counsel:

MICHAEL W. WARREN (NY BAR NO. 1686856)
LAW OFFICE OF MICHAEL W. WARREN, P.C.
30 Wall Street, Suite 800
New York, New York 10005
Telephone: 212.709.8200
Facsimile: 212.943.230
Email: tarifwarren@aol.com

TERI THOMPSON (GA BAR NO. 443999)
TERI THOMPSON, LLC
2330 Scenic Highway
Snellville, Georgia 30078
Telephone: 770.674.2890
Facsimile: 888.329.7330
Email: terithompson17@gmail.com

/ / /

APPENDIX 1 TO PLAINTIFFS'
PETITION FOR WRIT OF HABEAS                   CV
CORPUS PUSUANT TO 28 U.S.C. §
2241



**CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW**

256 SOUTH OCCIDENTAL BOULEVARD
LOS ANGELES, CA 90057
Telephone: (213) 388-8693 ext. 310
Facsimile: (213) 386-9484
www.centerforhumanrights.org

April 18, 2018

*Via USPS Priority Express Mail*
J. Patricia Wilson Smoot
Chairperson U.S. Parole Commission
90 K Street, N.E., 3rd Floor
Washington, D.C. 20530

Hearing Examiner
U.S. Parole Commission
90 K Street, N.E., 3rd Floor
Washington, D.C. 20530

Re:     Mutulu Shakur BOP Reg. No. 83205-01
          Parole Hearing April 30, 2018, Victorville, CA.

Dear Chairperson Smoot, Hearing Examiner, and Members of the Commission:

         I am writing to address Mr. Mutulu Shakur's upcoming parole hearing on April 30, 2018, and to respectfully urge you and the Commission to release Mr. Shakur on parole. Because there is adequate evidence that Mr. Shakur has not seriously or frequently violated prison rules while incarcerated and is unlikely to reoffend, it is presumed that he should be released on parole under 18 U.S.C. §4206(d). Congress intended this "mandatory parole" provision in § 4206(d) to provide "*a more liberal criteria for release* on parole for prisoners with long sentences after they have completed two-thirds of any sentence or thirty years, whichever occurs first." S. Rep. No. 94-648, at 27 (1976) (Conf. Rep.) (emphasis added). If Mr. Shakur is not released pursuant to § 4206(d), we respectfully seek his release under § 4206(a).

         In this case, Associate Warden S. Keilman, the Associate Warden of the prison where Mr. Shakur has been incarcerated for many years, states as follows:

> *From my observation and that of my colleagues, it is widely held that … [Shakur] has consistently dedicated himself to maintain character that is consistent with our goals of the safe and orderly operation of our facility, program involvement and he's demonstrated a personal initiative to enhance the overall environment to which he is engaged by maintaining a degree of respect across the various prisoner groups and my staff.* Further, I have been told this pattern has been consistent throughout the duration of his placement here; as evidenced by his direct involvement in intervention of racial conflicts as it has been specifically reported to me.

J. Patricia Wilson Smoot, U.S. Parole Commission
Hearing Examiner, U.S. Parole Commission                 Page 2
Re: Mutulu Shakur BOP Reg. No. 83205-01
April 18, 2018

*In review of Shakur's institutional record it is apparent that his age and lack of violence (or other disciplinary issues) indicate a desire towards his rehabilitation. I am aware of the controversy related to a previous incident used as a basis for his 2016 parole denial and it is my professional opinion conduct related to his 2013 Code 297 phone incident report does not reflect a lack of rehabilitation or a disrespect for institutional policies and authority.*

*In conclusion, I offer this letter as a recommendation for the parole of Inmate Shakur based on my observations and interactions with him. My years of experience with the Bureau has made me quite astute to the judgment of men and their character. <u>I sincerely believe if given the opportunity, Mr. Shakur will not re-offend and will abide by the law and be an asset to the overall environment and community</u>.*

See Exhibit 1 attached (emphasis supplied).

**<u>Offer of family residence</u>:**

   Maurice Shelton Shakur, Mr. Shakur's eldest son, describes his relationship with his father and offer of care and a residence in the following words:

I live in the city of Los Angeles with my wife Talia del Carmen Rodriguez. We have been married for over twelve years. I am a veteran of the United States Army. I am forty-eight years old and work as an entertainer with over 20 years of experience in the music industry.

*My wife and I would welcome having my father live with us upon his release. We would be happy to assist him with transportation, visits to medical appointments, and creating a new life in Los Angeles. We have a three-bedroom home so my father would have his own bedroom. If my father is able to find employment in Los Angeles, I am willing to transport him to and from work or to pay for transportation. We are very willing to assist my father in any way he needs our help in the process of acclimation and re-entry.*

My father and I maintain regular contact. He has established a close relationship with my wife Talia, and they get along very well …

*Finally … knowing my father perhaps better than anyone else, going back at least twenty years, he has encouraged me and his other children, and indeed the many people around the country who follow his statements, unequivocally and consistently, to reject criminality and violence in all their forms, and to lead our lives with kindness, modesty, and high moral standards.* He instilled those values in my half-brother Tupac Shakur, with the result the message reached millions of young people at a time when other famous rappers were glorifying gang violence. He has never glorified the crimes he engaged in over 30 years ago. *He has expressed nothing but remorse for those crimes and, as the person on earth perhaps*

J. Patricia Wilson Smoot, U.S. Parole Commission
Hearing Examiner, U.S. Parole Commission
Re: Mutulu Shakur BOP Reg. No. 83205-01
April 18, 2018

Page 3

> *closest to him, I am absolutely, one hundred percent, certain he will never reoffend*
> *if released on parole.*

See Exhibit 2 attached (emphasis supplied). As noted in the letter from Mr. Shakur's daughter, Sekyiwa Shakur, "[a]s an additional option, we own a home at GA- 883 Rays Rd., Stone Mountain, GA, 30083, where my dad can live. His mother resides close by. She is blind and suffers from dementia, and I believe his presence in her life would make a world of difference to her." See Exhibit 5.

### **Offers of employment:**

Because of his advanced age, Mr. Shakur would not have to work upon release however he wishes to work at least half-time and be left with time to adjust to reentry and spend time with his children and grandchildren. Mr. Shakur has two job offers. First, because of his interest and long-time advocacy for peaceful resolution of disputes and racial and economic justice, the Center for Human Rights and Constitutional Law would be pleased to have Mr. Shakur work with the organization half-time:

> For the past five years the Center for Human Rights and Constitutional Law has represented Mr. Mutulu Shakur in his legal proceedings …

> The Center is a non-profit, public interest legal foundation dedicated to furthering and protecting the civil, constitutional, and human rights of vulnerable communities … We provide a wide range of services to vulnerable low-income victims of human and civil rights violations and also offer technical support and training to hundreds of legal aid attorneys and paralegals every year … I also serve as the appointed Advocate for Civil Rights, Immigrant Affairs, and Equity for the City of Los Angeles. This work involves examining and recommending to the Los Angeles City Council proposed ordinances and policies regarding … marginalized communities, including issues relating to economic, national origin, and racial disparities.

> *We are strongly committed to helping Mr. Shakur successfully complete a re-entry* *program.* Given his long-standing belief and statements in favor a peaceful process for justice, dispute resolution, and healing, such as happens in the process of Truth and Reconciliation Commissions that have addressed social justice issues in the U.S. and abroad for many years, we would like to have Mr. Shakur work at the Center for 20 hours a week which will leave him time to spend with his immediate family members, attend medical appointments, and generally focus on a successful reentry program. *We have dedicated hundreds of hours researching the* *achievements of truth and reconciliation efforts around the world and look forward* *to Mr. Shakur's positive involvement in our work. We are fully prepared to* *compensate Mr. Shakur with a half-time salary of $15,000 per year.*

See Exhibit 3 attached (emphasis supplied).

Mr. Shakur has a second job offer in Los Angeles by the Asian American Drug Abuse Program

J. Patricia Wilson Smoot, U.S. Parole Commission
Hearing Examiner, U.S. Parole Commission
Re: Mutulu Shakur BOP Reg. No. 83205-01
April 18, 2018

Page 4

(AADAP). See Exhibit 4 attached.  Mike Watanabe, an MSW in social work, Vietnam Veteran, and President and CEO of AADAP, has submitted a letter to the Hearing Examiner and Commission offering Mr. Shakur full or part-time employment with AADAP:

> The Lincoln Hospital acupuncture detoxification program [founded and directed by Dr. Shakur] was ground breaking and something I studied as a student. Dr. Shakur's leadership and experience working with the Lincoln Hospital would be highly relevant to our programs. His skills and experience with community organizing and his ability to connect with young African American high-risk youth would also be an important asset in the work we do. It is for this reason that we would like to employ him in our Outreach Services Program …. This position will be based at our Center on Crenshaw Boulevard, which is easily accessible from the residence of his son where he would be living. He may work in this position full or half time …

> AADAP is one of 17 WorkSource Centers in Los Angeles. Should Dr. Shakur live in the Los Angeles area following his release, AADAP will connect him with social service resources to assist him in his community re-integration. A Vocational Counselor will be assigned and our Center houses staff from the California Employment Development Department (EDD), LA County Department of Social Services (DPSS), and other key Government departments.

See Exhibit 4 attached. While I have not yet received a confirming letter for the Commission, I am informed that a third job offer has been made by the Law Offices of Benjamin Grump in Los Angeles. That office works on a range of issues including civil rights cases.

### Faith-based leaders, family, and friends' support:

In her April 2, 2018, letter addressed to the Hearing Examiner and the Commission, Sekyiwa Shakur, the daughter of Mr. Shakur, states as follows:

> Tupac Shakur was my brother and my father's stepson. In my work for the Tupac Amaru Shakur Foundation, I focus on community engagement and speak to abused women and children on overcoming adversity.

> Since his incarceration, my father has expressed his remorse for his past crimes. My father has taught me (and he taught Tupac) that positive social change comes about not through crimes or violence, but by promoting peace and healing. The idea that if he is released he will return to crime would contradict everything he has shared with me and taught me for most of my life …

> [F]or many years my father has … consistently encouraged the young members of our family to pursue peaceful and positive actions if we cared about humanity and social justice. He has never expressed in any way support for crime or violence to achieve political ends … *He has become known to many throughout the country not as Mutulu Shakur the man involved in violent bank robberies to further political causes, but as Mutulu Shakur, the man who speaks out against gang violence, against*

J. Patricia Wilson Smoot, U.S. Parole Commission
Hearing Examiner, U.S. Parole Commission
Re: Mutulu Shakur BOP Reg. No. 83205-01
April 18, 2018

Page 5

*inmate-on-inmate violence, … and in support of empathy, understanding and healing*. That's who my dad is now.

See Exhibit 5 attached (emphasis in original).

Mutulu Shakur's son, Tyrone Campbell, explains how proud his father is of the positive youth mentoring and gang-intervention full-time work Tyrone is doing:

I live in New York, and am employed by Good Shepherd Services, a nonprofit dedicated to providing at risk youth with the resources they need to thrive. Over the last nine years, I have acted as a gang intervention specialist, violence awareness coordinator, afterschool coordinator, and youth mentor.

My father and I share a passion for serving low-income communities and promoting healing. He has expressed how proud he is of my work … [H]e has shared with me his ideas about reconciliation, healing and the role of love in the ongoing struggle to help those in need.

I believe whole-heartedly that my father is committed to living a peaceful and fruitful life. He has helped people throughout his time in prison …

*My father's embrace of harmony and non-violence are not just "positions" he takes every couple of years to impress the Parole Commission, they are sincerely held views he has shared over and over with his children, family, and supporters for many years*.

See Exhibit 6 attached (emphasis in original).

Over seventy (70) faith-based leaders associated with the National Black Church Initiative support Mr. Shakur's release. The faith-based letter states, in part:

… [Dr. Shakur] has consistently promoted and supported the peaceful resolution of social conflicts. Use of the salutation "stiff resistance" [a factor considered by the Commission in 2016] in no way invokes the notion that Dr. Shakur was encouraging others to engage in lawless behavior. To dissuade the Commission from this misunderstanding, … Dr. Shakur has even stopped using the salutation "stiff resistance." When someone consistently promotes the non-violent and lawful resolution of justice, and then uses the salutation "stiff resistance," that salutation must be read in the context of the author's substantive message, not read in isolation. Given his … open and public support for peaceful and democratic change, I sincerely hope the Commission does not deny Dr. Shakur parole merely because in the past he occasionally ended letters with the salutation "stiff resistance." There are many examples of individuals engaging in "stiff resistance" to personal failure, bad habits, selfishness or even the temptation of crime.

See Exhibit 7 attached.

J. Patricia Wilson Smoot, U.S. Parole Commission
Hearing Examiner, U.S. Parole Commission
Re: Mutulu Shakur BOP Reg. No. 83205-01
April 18, 2018

Page 6

Mr. Shakur's web site also makes clear his commitment to peaceful social change, his remorse for the crimes of which he was convicted over thirty years ago, and his rehabilitation. See Exhibit 8 attached. While his website also expresses the reasons why the Commission's prior decisions denying release appear to have been rendered in a manner inconsistent with several regulations relating to the conduct of parole hearings, the website more importantly conveys the same message of conflict resolution and mediation Mr. Shakur has shared for over two decades with BOP staff, fellow inmates, family and friends. See Exhibit 12 attached.

Quincy D. Jones, Jr., the world-renowned musician and music producer states in his letter addressed to the Hearing Examiner and Commission:

> The present health of Dr. Shakur makes him a perfect candidate for compassionate release. His advocacy for the past 30 years for peaceful conflict resolution also qualifies him for your consideration. Dr. Shakur poses no danger to the public nor is he at risk to re-offend. On the contrary, his message is a healing force, one of redemption and restitution. As you contemplate the fate of one man, please also consider the granting of Dr. Shakur's parole application will elevate and enrich the lives of so many others. I urge the immediate release of Dr. Mutulu Shakur.

See Exhibit 9 attached.

Finally, rather than resubmitting the large number of letters expressing support for Mr. Shakur's release and describing his long-held and widely expressed views in favor of peaceful resolution of disputes, please see attached excerpts of these letters. See Exhibit 13 attached. These letters, already part of the Commission's record, show that all those who know Mr. Shakur hold the view that he is fully rehabilitated, is sincerely remorseful for the crimes he was convicted of, and is absolutely committed to promoting reconciliation and mediation as the way to resolve conflict and address issues of social justice. *Id.*

### Bureau of Prison's Consistent and Positive Assessment of Mr. Shakur's conduct:

Mr. Shakur's institutional history serves as perhaps the most reliable evidence that upon release he will not reoffend. There is overwhelming uncontroverted evidence of Mr. Shakur's rehabilitation and positive conduct throughout his thirty years of incarceration. BOP staff has reported for over 15 years that Mr. Shakur has led a highly productive and exemplary life in prison.

In a parole hearing held fifteen years ago on July 17, 2002, the Hearing Examiner stated:

> And we've also, of course looked at your salient factor score, which gives us an idea of what kind of a parole risk you would be. And of course, you had no prior record prior to this series of events. *And so your salient factor score is the best score it can be.* It's a ten, which would indicate that you would be falling in the good parole risk category. [Emphasis added].

J. Patricia Wilson Smoot, U.S. Parole Commission
Hearing Examiner, U.S. Parole Commission
Re: Mutulu Shakur BOP Reg. No. 83205-01
April 18, 2018

A BOP supervisor testified at the 2002 hearing:

> … [I]t's been honor [supervising him]. And he's been working for me probably 5 or 6 years, I'm not sure how long. He's been an asset to the job. He's an asset to me. I can say he's an asset in general.  [Emphasis added].

A September 29, 2002, Initial Hearing Summary provides the following assessment of Mr. Shakur's conduct:

> Subject has programmed extensively while in BOP custody. *His accomplishments are well documented in the record and also in the progress report dated 5/16/2002.* In addition, subject submitted a copy of a certificate dated September 2002 in which he completed 33 hours in the CHANGE Psychotherapy Group program. Subject indicated that he has been involved in educational and recreational activities from a cultural diversity standpoint, in that he has helped line up speakers for workshops … Subject also indicated that he is involved in working with older inmates in helping them and himself understand the impact of aging and stress-related factors associated with institution life.

The Statutory Interim Hearing Prehearing Assessment prepared for Mr. Shakur's September 9, 2004, review states in part:

> … *the Subject has satisfactory institutional adjustment.* He currently works 32 hours per week on Laundry detail. On 2/13/03, he received a certificate for completion of the Elder Inmate Psychotherapy Group. He has maintained clear institutional conduct for the past 36 months. He has completed the A&O Program and will participate in the Pre-Release Program prior to release…

In January 2005 Plaintiff's Unit Manager, A. Kingston, submitted a memorandum to his superiors stating –

> [Mr. Shakur] has participated in the programs as recommended by his Unit Team. He has completed his GED requirements and his obligations to the Inmate Financial Responsibility program. He has earned good work performance evaluations ... *[T]he Unit Team does not believe this inmate to be a management problem and a custody reduction would not pose a threat to the security of this institution* … [Emphasis added]

The Hearing Summary of Plaintiff's February 8, 2005 hearing states:

> Since the last hearing this subject has completed Victim Impact, Stress Management and Anger Management. He participates in the Elder Cycle Therapy Group and he is an active member of the Suicide Watch Team … The subject receives good work reports from his job assignment …

In 2006 [Shakur] developed a proposal for the development of a program under which able-bodied inmates would provide assistance to inmates with physical or mental

J. Patricia Wilson Smoot, U.S. Parole Commission
Hearing Examiner, U.S. Parole Commission
Re: Mutulu Shakur BOP Reg. No. 83205-01
April 18, 2018

Page 8

disabilities. The proposal included recommendations such as inmates helping disabled inmates with cell cleanliness, education, support groups, discussion groups, etc.

The Hearing Summary of the parole hearing conducted December 11, 2007, states in part:

> [Mr. Shakur] is also a founding member of the Coleman Penitentiary No. 2 NAACP Chapter and received a certificate for this. Also in Atlanta, he took 6 hours of Group Psychotherapy Courses. The subject also participated in Culture Diversity Classes in 2006 and 4 hour Suicide Prevention Course in April 2005.

Plaintiff's Statutory Interim Hearing Pre-Hearing Assessment dated November 5, 2007, states in part:

> … [T]he Subject has satisfactory institutional adjustment. He currently works 32 hours per week on Laundry detail … *He has maintained clear institutional conduct for the past 36 months. He has completed the A&O Program and will participate in the Pre-Release Program prior to release* … [Emphasis supplied].

Mr. Shakur's December 2, 2009, Hearing Summary states in part:

> *Discipline: None* … [Mr. Shakur] has completed five programs since his hearing in 2007. They include Biography, Explorers in Early America, … Engineering and Empire, and History and Science Part 1. [Emphasis added].

Mr. Shakur's March 15, 2012 Interim Hearing Pre-Hearing Assessment states:

> *[T]he subject's adjustment since his last hearing has been without incident*. He is currently assigned as Unit Orderly. He has completed seven education courses: Beginning Crochet, Beginning Beading, Intermediate Art, DB Film Critic, Beginning Wellness, Delta Basic Guitar and Beginning Art. He is currently enrolled in Human Rights … His institutional adjustment has been satisfactory. *He has participated in programs, maintained a job assignment and has not incurred any DHO infractions since his last hearing* … . [Emphasis added].

Mr. Shakur's July 30, 2014 Interim Hearing Pre-Hearing Assessment states:

> Since his last hearing on 7/2/2012 the subject has completed 98 hours of educational/vocational programming as follows: Political Science (10 hrs.); House of Healing (10 hrs.); Beginners Voice/Vocal (6 hrs.); African History (10 hrs.); Breaking Barriers (10 hrs.); Creative Writing (10 hrs.); Beginning Crochet (12 hrs.); African History (30 hours) ….

The Hearing Summary of Mr. Shakur's August 12, 2014 parole hearing states in part:

J. Patricia Wilson Smoot, U.S. Parole Commission
Hearing Examiner, U.S. Parole Commission
Re: Mutulu Shakur BOP Reg. No. 83205-01
April 18, 2018

Page 9

> *Testimony of Case Manager Mico: Ms. Mico stated that the offender is very respectful of staff and inmates and has continuously availed himself to programs.* She testified that the offender recently suffered a stroke … . [Emphasis added].

Throughout this time, Mr. Shakur maintained the best score possible on the Commission's scale of parole risk, a 10 salient factor score. The Salient Factor Score ("SFS") is explicated at length in regulations promulgated at 28 C.F.R. § 2.20 (containing Parole Guidelines and Salient Factor Scoring Manual).

**Mr. Shakur's prison record does not disqualify him for release under 4206(a) or (d) and it shows he is highly unlikely to ever reoffend**:

Under Section 4206(a) (the discretionary parole provision), the Commission is required to consider "the nature and circumstances of the offense and the history and characteristics of the prisoner," as well as the inmates' adherence to prison rules. It may grant parole only where it "determines: (1) that release would not depreciate the seriousness of his offense or promote disrespect for the law; and (2) that release would not jeopardize the public welfare." 18 U.S.C. § 4206(a). These provisions give it broad discretion to determine whether to release the individual on discretionary parole. Under Section 4206(d), a different and more lenient calculus applies: the person is now presumptively entitled to parole, and the burden shifts to the Commission to show why release should not be granted. The reasons mandatory parole can be denied under § 4206(d) are limited to whether the inmate "has seriously or frequently violated institution rules and regulations or there is a reasonable probability that he will commit any … crime." Under Section 4206(d), the nature and seriousness of the underlying offense is no longer a relevant factor.

The very old one-time drug offense should not be considered a disqualifying factor under 18 U.S.C. §4206(d). It is not considered a "serious" offense by the BOP. It took place almost thirty years ago, it was a one-time violation. It did not involve violence or the threat of violence. Under prior guidance of the Commission, this single ancient positive drug test for morphine, with no available procedure for retesting, is not a "serious" rule violation that forever bars release under either § 4206(a) or (d). As the Commission's General Counsel noted in his Memorandum of December 2011, addressed to the Commission, whether a rule violation should be treated as "serious" preventing release under § 4206(d), but not necessarily under § 4206(a), there are "several factors that the Commission may weigh …" See Exhibit 10, page 4 of 8. As the Commission recognizes in the Commission's General Counsel Memorandum of December September 22, 2011, despite having previously found that a rule violation was "serious," in a later decision the Commission is, "also free to find that, in retrospect, [that its earlier] findings … as to the severity of the [rule violation] are not appropriate." See Exhibit 11 page 4. Factors to consider include use of a weapon, use of force, the incident's potential for injury, or to its potential to cause "turmoil within the institution." *Id*. Under these criteria, a 30-year old single positive drug test for morphine should not be considered a "serious" rule violation that automatically results in denial of release under § 4206(d).

Section 4206(d) provides that a prisoner shall not be released under that sub-section if

J. Patricia Wilson Smoot, U.S. Parole Commission
Hearing Examiner, U.S. Parole Commission
Re: Mutulu Shakur BOP Reg. No. 83205-01
April 18, 2018

Page 10

he has "frequently violated institution rules." Frequent means "*occurring often or in close succession; habitual; constant*." *The Oxford Desk Dictionary* at 321. (Emphasis added).

Mr. Shakur has received four or five telephone-related rule violations spanning his 30-years in prison. None of the alleged telephone rule infractions dealt with serious phone abuse (such as those described in the rules involving plans to escape, plans to obtain drugs, plans to commit crimes, etc.) In each instance, the phone calls at issue involved Mr. Shakur *encouraging non-violence*, anti-gang messaging, and healing. The early 2000s telephone calls involved a music project which included a specific anti-gang/anti-violence message.

The 2013 telephone violation is currently under DHO appeal because the DHO was not certified to hear cases when she presided over Mr. Shakur's hearing, and the evidence (a tape recording) was deleted even though Mr. Shakur requested that it be preserved. See Exhibit 14 attached.

Four or five minor phone violations over a period of about thirty (30) years does not mean Mr. Shakur "frequently" violated prison rules. *This amounts on average to a minor rule violation once every five to seven years in custody.*

Notices of Action issued by the Commission over the past two years released to us under the FOIA show that when the Commission denied a prisoner parole based on "frequent" rule violations, the mean number of violations was 20.5. Mr. Shakur has very few minor violations compared to the average inmate denied release under § 4206(d) in the two years prior to the Commission's response to our FOIAS request.

Under 18 U.S.C. §4206(d) there is a presumption that a prisoner will be released on parole unless he is likely to reoffend. Neither the old minor phone violations (none involving threats of violence or planned criminal conduct) or Mr. Shakur's 2013 phone violation now on appeal show that he is likely to reoffend if released on parole.

The facts surrounding the 2013 telephone call are not in dispute. Mr. Shakur placed a phone call to university professor Karin Stanford who placed the call on her speaker phone and invited Mr. Shakur to say a few words to a group of students and professors gathered to hear actor Danny glover speak on his film. Professor Stanford's sworn statement (attached as Exhibit 12) explains:

Mr. Shakur's contribution to the event was positive and he was a voice for healing and reconciliation, which I am very glad students had the opportunity to hear. At no time did Mr. Shakur say anything that was an incitement to violence or criminality. On the opposite, his message was one of working within the system to achieve healing and reconciliation …

Looking at the content on the phone call, Mr. Shakur only spoke about abiding by the law and peaceful change and there is no evidence to the contrary.

J. Patricia Wilson Smoot, U.S. Parole Commission
Hearing Examiner, U.S. Parole Commission
Re: Mutulu Shakur BOP Reg. No. 83205-01
April 18, 2018

Page 11

A brief phone call to university students urging them to support peaceful social change does not indicate Plaintiff is likely to reoffend.

The Hearing Examiner and the Commission may consider that Mr. Shakur has been identified by others and occasionally referred to himself as a political prisoner.

Please consider that Mr. Shakur has respected every stage of the criminal justice process throughout 30 years of litigation and incarceration. *He has never argued that his conviction is "political" in nature or that his conviction was politically motivated*. He has fully accepted his conviction. However, even the judge who presided at his trial clearly said that the crimes of which Mr. Shakur was convicted were politically motivated. The indictment itself discusses the political nature of the crimes charged.

During the trial, U.S. District Judge Charles S. Haight, Jr. acknowledged the political nature of Mr. Shakur's history, circumstance, motivation and intentions related to his conviction. The District Judge described Shakur's defense as follows:

> Shakur's defense had at its core the proposition that while his *political* goals were to further the fortunes of African-Americans, his means were peaceful and law-abiding, rather than violent and criminal. While Shakur did not testify in his defense, he called 26 witnesses, the majority of whom testified about Shakur's public, *political*, and non-violent activities, extending over a number of years, and the concerns about governmental persecution that Shakur harbored as a result.
> *Shakur v. United States*, 32 F. Supp. 2d 651, 665 (SDNY Jan. 13, 1999)
> (emphasis supplied)

Mr. Shakur has occasionally referred to himself as a "political" prisoner because the activities in which he engaged leading to his conviction were motivated by political beliefs, and because he has served as a political prisoner defusing gang-violence in prison. Other inmates and even staff refer to such prisoners as "political" prisoners because of their actions defusing gang confrontations and violence. Mr. Shakur has been considered a "political prisoner" because of his involvement in working with prison groups to *obey* the prison rules and avoid confrontations, this shows he is *unlikely,* not likely, to reoffend if released on parole.

The Hearing Examiner and the Commission may also consider that Mr. Shakur has also referred to himself as a victim of COINTELPRO. This does not show that he not rehabilitated or likely to reoffend if released on parole.  It is not disputed that Trial Judge Haight, Jr. stated that documents obtained during the trial "*demonstrate that for a considerable time Shakur ...[has] been the subject of illegal surveillance, harassment, and disinformation by the FBI as part of that lamented, unconstitutional project known as COINTELPRO.*" *United States v. Shakur*, 1988 U.S. Dist. LEXIS 2762, pp. 16-17 (1988) (emphasis added). In short, Government documents released long ago unquestionably show that Mr. Shakur was a victim of the COINTELPRO program. Stating that he was a victim of COINTELPRO is an accurate and truthful statement and does not show in any way that Mr. Shakur is likely to reoffend if released on parole.

J. Patricia Wilson Smoot, U.S. Parole Commission
Hearing Examiner, U.S. Parole Commission
Re: Mutulu Shakur BOP Reg. No. 83205-01
April 18, 2018

Page 12

Finally, the Hearing Examiner and the Commission may consider that Mr. Shakur in a few letters over the years used the salutation "stiff resistance." *Mr. Shakur has not used this salutation for two years because he does not want the Commission or anyone else to misinterpret that salutation when he occasionally used it.* He has previously explained to the Commission::

> My salutation "stiff resistance" purpose has been to serve as a reminder and to fortify an individual's character and resolve in the face of their specific challenges. The objective of "stiff resistance" is now and has always been about the quality of life. I have never intended its use to encourage criminality or … to target the government.

Many groups with internet presence have entirely lawful goals but use the age-old term "resistance." The "Culture of Resistance Network" aims to promote and support organizations, activists, and artists who seek a more peaceful, just, and democratic world. http://culturesofresistance.org. "Critical Resistance" through its outreach works toward creating "lasting alternatives to punishment and imprisonment." http://criticalresistance.org/about/not-so-common-language/. The goal of "Bay Resistance" is to advance racial, economic, climate, and gender justice. http://www.nwdcresistance.org/. In May 2017 the media reported Hillary Clinton was establishing a "Resistance" Political Action Committee. https://www.cnn.com/2017/05/04/politics/clinton-pac-resistance-trump/index.html  The fact that several years ago Mr. Shakur occasionally used the salutation "stiff resistance" does not mean he is likely to reoffend. His consistent message, including above anything he ever signed with the salutation "stiff resistance," has been a message of reconciliation and healing, not of promoting or in any way endorsing illegal conduct.

**A Comprehensive Risk Assessment Report confirms Mr. Shakur will not reoffend if released**:

The report prepared by Dr. John Mathew Fabian shows that it is highly unlikely Mr. Shakur will reoffend if released on parole The comprehensive risk assessment report prepared by Dr. John Mathew Fabian, Psy.D., J.D., ABPP, shows that it is highly unlikely Dr. Shakur will reoffend if released. See Ex. 16 attached (Forensic Psychological Evaluation, Forensic Neuropsychological Evaluation, Pre-Parole Risk Assessment).

Dr. Fabian's report is based upon an in-depth review of the record and a lengthy in-person forensic and clinical interview with Dr. Shakur in 2016. Dr. Fabian is a nationally renowned psychologist, lawyer and risk assessment expert who has been used numerous times by courts, law enforcement and prisoners to assess the risk of reoffending if released from custody in a range of circumstances. See Ex. 15 Curriculum Vitae of Dr. Fabian.

In evaluating Shakur, Dr. Fabian administered and considered several well established tests/criteria including the Federal Post-Conviction Risk Assessment, Level of Service Inventory-Revised (LSI-R), the Hare Psychopathy Checklist-Revised (Hare PCLR), and the Inventory of Offender Risk, Needs, and Strengths (IORNS). These are all tests commonly

J. Patricia Wilson Smoot, U.S. Parole Commission
Hearing Examiner, U.S. Parole Commission
Re: Mutulu Shakur BOP Reg. No. 83205-01
April 18, 2018

Page 13

used by law enforcement agencies, courts and experts to assess the risk of someone offending if released from custody on probation or parole.

Dr. Fabian concludes in relevant part: "There was no elevation for psychopathy or severe criminal personality. There was no clinically significant elevation for intra/interpersonal problems, alcohol/drug problems, aggression or negative social influences." Exhibit 16 at page 15. On the LSI-R test, "he presents as a low-risk/needs group. His cumulative frequency for prison inmates was 6.6%, meaning that 93-94% of the inmates would have higher scores than him." *Id*. at 15. It is Dr. Fabian's opinion that his score on the Hare PCL-R is about 7, indicating very low and no significant antisocial and psychopathic personality traits. *Id*. at 14.

Dr. Fabian provides the following conclusions based on his review of the records, administering of several tests and an in-depth interview with Dr. Shakur:

He has exhibited a motivation to change, especially regarding his prior more radical militant attitudes about racial change and human rights versus the current more peaceful means to demonstrate reconciliation between races …

He has maintained good educational attainment prior to his arrest with a doctorate in acupuncture, as well as consistent educational attainment within the BOP. There is no evidence of mental health problems, gambling addiction, or current criminal associates by my understanding. He has not engaged in gang activity or weapons concerns while in prison. He will have a good outlook as far as financial condition, and there is no significant evidence of life skill deficiencies, mental impairment, or low cognitive functioning. … [Today] [h]e is more an advocate of equal human rights through peaceful means … He has not been involved with gang-related behaviors or the Black Guerilla family, for example. Rather, he has been considered as a mentor and a peacekeeper within the prison system … He wants to be a good example for the younger blacks in prison and is promoting reconciliation rather than violence …

*Id*. at 16-19.

This assessment is fully consistent with Dr. Shakur's message, correspondence, statements and conduct for over twenty years, all well documented and most of it part of the record.

Thank you for your consideration of the matters addressed in this correspondence.

Respectfully,

Peter Schey
Attorney at Law

cc:  Mutulu Shakur

**MUTULU SHAKUR, BOP #83205-012**
**EXHIBITS IN SUPPORT OF PAROLE HEARING**
**VICTORVILLE, CALIFORNIA**

**April 30, 2018**

1. 4/9/18 - Bureau of Prisons Deputy Warden Recommendation..................15

2. 4/13/18  Mopreme Shakur offer of a residence ..............................17

3. 4/13/18  Center for Human Rights offer of employment ..........................19

4. 3/21/18  Asian American Drug Abuse Program offer of employment.......21

5. 4/2/18  Sekyiwa Shakur offer of family support .................................. 23

6. 4/1/18  Tyrone Campbell offer of family support........................................25

7. 4/2/18  National Black Church Initiative letter signed by 70 pastors........ 27

8. 3/31/18  Quincy Jones letter of support .......................................... 32

9. 12/2/11  General Counsel USPC Memorandum ..................................34

10. 9/22/11  General Counsel USPC Memorandum ............................... 42

11. 4/12/18 - Mutulu Shakur Website .................................................... 46

12.  Excerpts from 2016 Parole Hearing Support Letters................................ 52

13.  Letter to BOP re pending appeal of 2013 telephone rule violation ….....67

14.  Dr. John Fabian Curriculum Vitae............................................................70

15.  Dr. John Fabian Pre-Parole Risk Assessment ............................................ 79

/ / /

Exhibit 1



**U.S. Department of Justice**
**Federal Bureau of Prisons**
**United States Penitentiary**

_____

*USP VICTORVILLE, CALIFORNIA 92394*

April 9, 2018

United States Parole Commission
Washington D.C.
Re: Inmate Shakur, Mutulu
Reg. No. 83205-012

Dear Commissioners,

This letter is in reference to Mr. Shakur a Federal inmate who is currently housed at the United States Penitentiary (USP) Victorville, California.  I became familiar with Mr. Shakur while assigned as the Associate Warden who oversees Correctional Services as well as the daily operations at the United States Penitentiary (USP) Victorville. My efforts regarding my occupation encompass an objective hands-on approach to both the interaction with and management of the inmate population.

From my observation and that of my colleagues, it is widely held that excluding the nature of Shakur's convictions he has consistently dedicated himself to maintain character that is consistent with our goals of the safe and orderly operation of our facility, program involvement and he's demonstrated a personal initiative to enhance the overall environment to which he is engaged by maintaining a degree of respect across the various prisoner groups and my staff.  Further, I have been told this pattern has been consistent throughout the duration of his placement here; as evidenced by his direct involvement in intervention of racial conflicts as it has been specifically reported to me.

In review of Shakur's institutional record it is apparent that his age and lack of violence (or other disciplinary issues) indicate a desire towards his rehabilitation.  I am aware of the controversy related to a previous incident used as a basis for his 2016 parole denial and it is my professional opinion conduct related to his 2013 Code 297 phone incident report does not reflect a lack of rehabilitation or a disrespect for institutional policies and authority.

In conclusion, I offer this letter as a recommendation for the parole of Inmate Shakur based on my observations and interactions with him. My years of experience with the Bureau has made me quite astute to the judgment of men and their character.  I sincerely believe if given the opportunity, Mr. Shakur will not re-offend and will abide by the law and be an asset to the overall environment and community.

Respectfully submitted,

Associate Warden S. Keilman

16

Exhibit 2

**Maurice Shelton Harding Shakur**
3448 La Clede Avenue
Los Angeles, CA 90039
(323) 383-4281

J. Patricia Wilson Smoot                                                  April 2, 2018
Chairperson U.S. Parole Commission
90 K Street, N.E., Third Floor
Washington, D.C. 20530

*Re: Interim Parole Hearing - Mutulu Shakur, BOP Reg. No. 83205-012*

Dear Chairperson Smoot, members of the Parole Commission, and Hearing Examiner:

     I am the eldest son of Dr. Mutulu Shakur. I live in the city of Los Angeles with my wife Talia del Carmen Rodriguez. We have been married for over twelve years. I am a veteran of the United States Army. I am forty-eight years old and work as an entertainer with over 20 years of experience in the music industry.

     My wife and I would welcome having my father live with us upon his release. We would be happy to assist him with transportation, visits to medical appointments, and creating a new life in Los Angeles. We have a three-bedroom home so my father would have his own bedroom. If my father is able to find employment in Los Angeles, I am willing to transport him to and from work or to pay for transportation. We are very willing to assist my father in any way he needs our help in the process of acclimation and re-entry.

     My father and I maintain regular contact. He has established a close relationship with my wife Talia, and they get along very well. As mentioned above, if approved to do so, we would love to have my father live with us.

     Finally, I do want the Hearing Examiner and the Parole Commission to be aware that knowing my father perhaps better than anyone else, going back at least twenty years, he has encouraged me and his other children, and indeed the many people around the country who follow his statements, unequivocally and consistently, to reject criminality and violence in all their forms, and to lead our lives with kindness, modesty, and high moral standards. He instilled those values in my half-brother Tupac Shakur, with the result the message reached millions of young people at a time when other famous rappers were glorifying gang violence. He has never glorified the crimes he engaged in over 30 years ago. He has expressed nothing but remorse for those crimes and, as the person on earth perhaps closest to him, I am absolutely, one hundred percent, certain he will never reoffend if released on parole.

     Respectfully,

*Maurice Smoot*

Maurice Shelton Harding Shakur

18

Exhibit 3



**CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW**
256 SOUTH OCCIDENTAL BOULEVARD
LOS ANGELES, CA 90057
Telephone:  (213) 388-8693
Facsimile:  (213) 386-9484
www.centerforhumanrights.org

April 17, 2018

J. Patricia Wilson Smoot
United States Parole Commission
90 K Street, N.E., Third Floor
Washington, D.C. 20530

*Re: Interim Parole Hearing – Mutulu Shakur, BOP Reg. No. 83205-012*

Dear Chairperson Smoot, members of the Parole Commission, and Hearing Examiner:

For the past five years the Center for Human Rights and Constitutional Law has represented Mr. Mutulu Shakur in his legal proceedings. Today we write to inform the Commission and its Hearing Examiner that upon his release the Center intends to offer Mr. Shakur a part-time job to assist with his re-integration into society.

The Center is a non-profit, public interest legal foundation dedicated to furthering and protecting the civil, constitutional, and human rights of vulnerable communities including immigrants, children and youth, prisoners, and the poor. We provide a wide range of services to vulnerable low-income victims of human and civil rights violations and also offer technical support and training to hundreds of legal aid attorneys and paralegals every year. In addition to this work, I also serve as the appointed Advocate for Civil Rights, Immigrant Affairs, and Equity for the City of Los Angeles. This work involves examining and recommending to the Los Angeles City Council proposed ordinances and policies regarding low-income marginalized communities, including issues relating to economic, national origin, and racial disparities.

We are strongly committed to helping Mr. Shakur successfully complete a re-entry program. Given his long-standing belief and statements in favor a peaceful process for justice, dispute resolution, and healing, such as happens in the process of Truth and Reconciliation Commissions that have addressed social justice issues in the U.S. and abroad for many years, we would like to have Mr. Shakur work at the Center for 20 hours a week which will leave him time to spend with his immediate family members, attend medical appointments, and generally focus on a successful reentry program.  We have dedicated hundreds of hours researching the achievements of truth and reconciliation efforts around the world and look forward to Mr. Shakur's positive involvement in our work. We are fully prepared to compensate Mr. Shakur with a half-time salary of $15,000 per year.

Respectfully,

Peter Schey
President and Executive Director
Center for Human Rights and Constitutional Law

Exhibit 4



# AADAP, Inc.
### (Asian American Drug Abuse Program )
www.aadapinc.org

2900 Crenshaw Blvd.
Los Angeles, CA 90016
Tel  : (323) 293-6284
Fax : (323) 295-4075
TTY/TTD: (323) 639-4501

March 21, 2018

J. Patricia Wilson Smoot
Chairperson U.S. Parole Commission
90 K Street, N.E., 3rd Floor
Washington, D.C. 20530
*Re: Interim Parole Hearing - Mutulu Shakur, BOP Reg. No. 83205-012*

Dear Chairperson Smoot, members of the Parole Commission, and Hearing Examiner:

For the past forty-three years I have worked for the Asian American Drug Abuse Program (AADAP) in Los Angeles. I have been President and CEO for thirty-six of those years. I am a UCLA MSW social worker and a Vietnam Veteran. Over the past several years, I have become aware of the history of Dr. Mutulu Shakur and his present circumstances.

The Lincoln Hospital acupuncture detoxification program was ground breaking and something I studied as a student. Dr. Shakur's leadership and experience working with the Lincoln Hospital would be highly relevant to our programs. His skills and experience with community organizing and his ability to connect with street addicts would also be an important asset in the work we do. It is for this reason that we would like to employ him in our Outreach Services Program as Health Educator Specialist - Syringe Access Overdose Prevention. This position will be based at our Center in Inglewood, which is easily accessible from the residence of his son where he would be living. He may work in this position full or half time.

AADAP currently provides treatment and resettlement services for prisoners being released by the California Department of Corrections and Rehabilitation (CDCR). We also implement a Drug Court Program with the Inglewood Superior Court.  Our programs utilize community organizing to engage individuals against substance abuse.

AADAP is one of 17 WorkSource Centers in Los Angeles. Should Dr. Shakur live in the Los Angeles area following his release, AADAP will connect him with social service resources to assist him in his community re-integration. A Vocational Counselor will be assigned, and our Center houses staff from the California Employment Development Department (EDD), LA County Department of Social Services (DPSS), and other key Government departments.

I know that Dr. Shakur was convicted of very serious crimes. As with all our clients, we accept the past for what it is, and we work toward a new beginning. If he is granted this opportunity by the members of the Parole Commission, we are ready to assist him.

Respectfully,

Mike Watanabe, MSW, LHD
President & CEO
AADAP, Inc.

| Therapeutic Community | Outpatient Unit | Outpatient Counseling | Youth & Family Programs | Indochinese Youth & Community Center | Youth Outpatient Treatment | L.B. Outpatient Counseling | Outreach Program | Olympia Academy |
|---|---|---|---|---|---|---|---|---|
| 5318 S. Crenshaw Blvd. | 520 S. La Brea Ave. | 1088 S. La Brea Ave. | 14112 S. Kingsley Drive | 13931 Van Ness Ave. | 1360 E. Anaheim St. Ste.202 | 652 E. Manchester Blvd. | (323) 933-9022 |
| Los Angeles, CA 90043 | Inglewood, CA 90302 | Los Angeles, CA 90019 | 4625 Crenshaw Blvd. | Gardena, CA 90249 | Long Beach, CA 90813 | Inglewood, CA 90301 | Fax. (323) 933-4029 |
| (323) 293-6291 | (323) 294-4932 | (323) 295-0262 | Los Angeles, CA 90043 | (310) 768-8064 | (562) 218-9530 Counseling | (213) 440-0256 |
| Fax. (323) 293-1091 | Fax. (323) 294-2533 | Fax. (323) 295-2375 | (323) 596-2310 | Fax. (310) 768-2779 | (310) 768-8018   (562) 912-7916 Drug Court | Fax. (323) 294-2533 |
| | | | Fax. (323) 596-2317 | | Fax. (310) 768-4170   Fax. (562) 200-9616 | |

22

Exhibit 5

# SEKYIWA SHAKUR

1A WEST KAPPAS MARINA
SAUSALITO, CA 94965
TELEPHONE (415) 299-3408
SETSHAKUR@GMAIL.COM

April 2, 2018

J. Patricia Wilson Smoot
Chairperson U.S. Parole Commission
90 K Street, N.E., Third Floor
Washington, D.C. 20530

*Re: Interim Parole Hearing - Mutulu Shakur, BOP Reg. No. 83205-012*

Dear Chairperson Smoot, members of the Parole Commission, and Hearing Examiner:

I am writing to you with regards to my father Mutulu Shakur's upcoming parole hearing. Tupac Shakur was my brother and my father's step-son. In my work for the Tupac Amaru Shakur Foundation, I focus on community engagement and speak to abused women and children on overcoming adversity.

Since his incarceration, my father has expressed his remorse for his past crimes. My father has taught me (and he taught Tupac) that positive social change comes about not through crimes or violence, but by promoting peace and healing. The idea that if he is released he will return to crime would contradict everything he has shared with me and taught me for most of my life.

In 2016 the proposed release plan was for my father to come to Sausalito and live with my mother, Afeni Shakur, and work for Amaru Entertainment. My mother passed away on May 2, 2016.

It is my understanding that my half-brother Moprene Shakur and his wife Talia, have offered housing to my father. They would provide Mutulu with love and support. If that did not work out for any reason, my father is welcome to stay in my home. As an additional option, we own a home at GA- 883 Rays Rd., Stone Mountain, GA, 30083, where my dad can live. His mother resides close by. She is blind and suffers from dementia, and I believe his presence in her life would make a world of difference to her.

I know with absolute certainty that for many years my father has been rehabilitated. He has consistently encouraged the young members of our family to pursue peaceful and positive actions if we cared about humanity and social justice. He has never expressed in any way support for crime or violence to achieve political ends. That may have been his state of mind more than thirty years ago, but his children and family have been guided for many years by his message of reconciliation and healing. *He has become known to many throughout the country not as Mutulu Shakur the man involved in violent bank robberies to further political causes, but as Mutulu Shakur, the man who speaks out against gang violence, against inmate-on-inmate violence, against any violence, and in support of empathy, understanding and healing.* That's who my dad is now. Please give him a fair and open-minded hearing on his application for release on parole.

Sincerely,

Sekyiwa Shakur

24

Exhibit 6

Tyrone Gerard Campbell
124-08 155th Street
Jamaica, NY 11434
Tyronecampbell7016@gmail.com
(516) 425-0267

April 1, 2018

J. Patricia Wilson Smoot
Chairperson U.S. Parole Commission
90 K Street, N.E., Third Floor
Washington, D.C. 20530

*Re: Interim Parole Hearing - Mutulu Shakur, BOP Reg. No. 83205-012*

Dear Chairperson Smoot, members of the Parole Commission, and Hearing Examiner:

I am a son of Mutulu Shakur. About 3 years ago I found out that Mutulu Shakur is my father. I live in New York, and for nine years I was employed by Good Shepherd Services, a nonprofit dedicated to providing at risk youth with the resources they need to thrive. Over the last nine years, I have acted as a gang intervention specialist, violence awareness coordinator, afterschool coordinator, and youth mentor. I now exercise my passion to help our at risk youth through the same above skills ,but for the most part I do it pro bono, I also provide our at risk youth with hands on entrepreneur training as well as employment through my mobile start up detailing company.

My father and I share a passion for serving low-income communities and promoting healing. He has expressed how proud he is of my work. Like he has with so many others, he has shared with me his ideas about reconciliation, healing and the role of love in the ongoing struggle to help those in need.

I believe whole-heartedly that my father is committed to living a peaceful and fruitful life. He has helped people throughout his time in prison, and he will continue to engage in selfless acts of healing upon his release. He wants to serve low-income communities and at-risk youth by educating them on being constructive members of society. His goals are very similar to the work I ended up doing in my life.

My father has never said or written anything to me that in any way celebrated or glorified the crimes he was charged with during the late 1970s. I just visited my father yesterday and based on our visit I can sincerely say that he feels deep remorse for those crimes and absolutely rejects that type of conduct to achieve a better world. He fully embraces the kind of positive community work that I am doing and, as mentioned above, expresses how proud he is of my work steering youth away from gang involvement and violence.

*My father's embrace of harmony and non-violence are not just "positions" he takes every couple of years to impress the Parole Commission, they are sincerely held views he has shared over and over with his children, family, and supporters for many years.*

Respectfully,

Tyrone Campbell

26

Exhibit 7



*"Bringing people together to serve humanity"*

P.O. Box 65177
Washington, DC 20035
202 • 744 • 0184
dcbci2002@gmail.com

April 2, 2018

J. Patricia Wilson Smoot
Chairperson U.S. Parole Commission
90 K Street, N.E., Third Floor
Washington, D.C. 20530

*Re: Interim Parole Hearing - Mutulu Shakur, BOP Reg. No. 83205-012*

Dear Chairperson Smoot, members of the Parole Commission, and Hearing Examiner:

I am the President and founder of the National Black Church Initiative (NBCI), a coalition of 15 religious denominations consisting of a 34,000 church network working to address issues of racial disparity in several areas including healthcare, education, and housing.

I understand that Dr. Mutulu Shakur was denied parole in 2016, in part, because he signed two letters with the salutation "stiff resistance." I believe that the Parole Commission understood this salutation to mean that upon release Dr. Mutulu would offend again.

I am informed that Dr. Shakur has not been involved in a single violent incident in thirty years of incarceration and that since his 1988 conviction he has consistently promoted and supported the peaceful resolution of social conflicts.

Use of the salutation "stiff resistance" in this situation in no way invokes the notion that Dr. Shakur  was encouraging others to engage in lawless behavior. To dissuade the Commission from this misunderstanding, I have been informed that Dr. Shakur has even stopped using the salutation "stiff resistance." When someone consistently promotes the non-violent and lawful resolution of justice, and then uses the salutation "stiff resistance," that salutation must be read in the context of the author's substantive message, not read in isolation. Given his thirty years of avoiding any incidents of violence while serving his sentence, and his open and public support for peaceful and democratic change, I sincerely hope the Commission does not deny Dr. Shakur parole merely because in the past he occasionally ended letters with the salutation "stiff resistance." There are many examples of individuals engaging in "stiff resistance" to personal failure, bad habits, selfishness or even the temptation of crime. Some who care about social justice may also express stiff resistance to injustice ,or poverty.

Respectfully, your humble servant in Christ

Reverend Anthony Evans
President

Rev. Edwin L. Jones, Ph.D.
Faith Christian University Church

Rev. Amos Ballenger
Mt. Zion Baptist Church

Rev. John Norman
Mt. Zion Baptist Church

Rev. Everett Harris
Mt. Zion Baptist Church

Rev. Winston C. Ridley, Jr.
The Greater First Baptist Church

Rev. Gerald L. Martin
Morning Star Baptist Church

Bishop Ode H. Hines
Greater Good Samaritan Baptist Church

Rev. William Calvert
Heavenly Bound Baptist Church

Rev. Virgil Murphy
Temple Missionary Baptist Church

Bishop Robert Wilson
Word Of Truth Church

Rev. Alex L. Lambert
St. Paul Baptist Church

Dr. A.H. Mark Dean
All For Jesus Scripture Art

Rev Marcus Tillman
First Baptist Church

Rev. Dr. Cynthia T. Turner
Dayspring Community Church

Rev. Lue Willi Rodgers
Mt. Zion Baptist Church

Rev. Omar Buchanan
Mt. Zion Baptist Church

Rev. Harry Song
Mt. Zion Baptist Church

Rev. Jeff Eddy
National Lay leader

Rev. Dr. Tom A. Bailey
Victory Temple Missionary Baptist Church

Bishop Scottie F Jackson
River of Life Pentecostal Church

Rev.. Robert Lawrence Earls, Sr.
St. John Baptist Church

Bishop Thomas P. Beale, Jr.
Church of the Way

Rev. Rodney Blackmon
Christian Unity Baptist Church

Bishop Harry Carter, Jr.
Zion Baptist Church

Dr. Anthony Mays
Breakthrough Bible College

Elder Willie R. Hunt
New Community Church of God In Christ

Rev. Aubrey C. Lewis, Pastor
St. Luke Baptist Church

Rev. Dr. Rudolph White, Pastor
New Southern Rock Baptist Church

Rev. Queen Shepherd, Pastor
Powerhouse Ministry International

Rev. Darrell Lewis, Pastor
Family Fellowship Church

Rev. Elijah Sutton, Pastor
Guildfield Baptist Church

Rev. Lloyd Fennell, Assistant Pastor
Guildfield Baptist Church

Rev. Dr. Cleophus W. Atkins, Pastor
Restoration Christian Fellowship Church

Rev. Arafa Speaks
New African Church

Rev. Anthony White, Youth Minister
New Southern Rock Baptist Church

Rev. Edward Cole
Associate Minister

Rev. Milton R. Baker
Christian Faith Center Ministry, Inc

Rev. Ruth Sutton
Guildfield Baptist Church

Rev. Ronald Patterson
Guildfield Baptist Church

Rev. Lanier C. Twyman, Sr.
St. Stephens Baptist Church

Rev. Betty Crawford
Guildfield Baptist Church

Rev. Alan Horton
Guildfield Baptist Church

Rev. Antonio Lowery
Guildfield Baptist Church

Guildfield Baptist Church

Rev. Tommy Lee Gilbert
Guildfield Baptist Church

Rev. Denise Mills
Guildfield Baptist Church

Rev. Tereasa Blanks
Guildfield Baptist Church

Rev. Richard Winston
Guildfield Baptist Church

Rev. Matthew Robinson
Guildfield Baptist Church

Rev. Eugene W. Wilson, Sr.
Wilson Ministries

Rev. Walter A. Pettiford, Sr.
New Beginning Ministries

Rev. Wilbert & Dolores Gray
PG Sheriff Office Chaplin

Rev. Larry Phillip McCray
Mt. Calvary Missionary Baptist

Rev. Jerome Williams
Williams Ministries

30

Dr. A.D. Mark Dean
Art For Jesus Scripture Art

Rev Marcus Lemman
First Baptist Church

Rev. L.D. Williams
Divine Prosperity Baptist Church

Dr. Edrick R. Upshur
New Generation Baptist Bible Church

Bishop William H. Thompson
Greater Praise Temple Ministries

Frank A. Lee, Sr.
Abounding Love Church

Rev. Albert W. Montgomery, Sr.
Agape Missionary Baptist Church

Dr. Anthony Moss
Breakthrough Bible College

Elder Willie R. Hunt
New Community Church of God In Christ

Bishop Dekontee H. Johnson
Blessed Word of Life Ministries

Dr. Williams Wright
Emmanuel Bible Fellowship Church

Bishop Joshua Paul Logan
Promised Land Ministries

Bishop K. J. Rogers
Unity Cathedral

Bishop M. Preston Stancil
Providence Harvest Church

31

Exhibit 8



QUINCY JONES
PRODUCTIONS

31 March 2018

LETTER IN SUPPORT OF APPLICATION BY INMATE MUTULU SHAKUR
#83205-012 FOR PAROLE, COMPUTATION OF SENTENCE AND/OR
COMPASSIONATE RELEASE

Department of Justice
Parole Board
Case Operations
United States Parole Commission
90 K Street, NE, Third Floor
Washington, D.C., 20530

Dear Sir/Madam:

I submit this letter in support of Dr. Mutulu Shakur's parole application. The present
health of Dr. Shakur makes him a perfect candidate for compassionate release. His
advocacy for the past 30 years for peaceful conflict resolution also qualifies him for your
consideration.

Dr. Shakur poses no danger to the public nor is he at risk to re-offend. On the contrary,
his message is a healing force, one of redemption and restitution. As you contemplate the
fate of one man, please also consider the granting of Dr. Shakur's parole application will
elevate and enrich the lives of so many others. I urge the immediate release of Dr. Mutulu
Shakur.

Respectfully,

Quincy D. Jones, Jr.

Exhibit 9

Memorandum

EXHIBIT

P-17



| Subject | Date |
|---|---|
| Bowers, Veronza<br>Reg. No. 35316-136 | December 1, 2011 |

| To | From *Rockne Chickinell* |
|---|---|
| Cranston J. Mitchell<br>Vice Chairman<br>U.S. Parole Commission | Rockne Chickinell<br>General Counsel<br>U.S. Parole Commission |
| Patricia K. Cushwa *PKC*<br>Commissioner | |
| J. Patricia Smoot<br>Commissioner | |

### Summary

   This case is before the Commission after a decision to re-vote on whether Bowers should be granted mandatory parole under the criteria of 18 U.S.C. § 4206(d).  Counsel for the prisoner and all interested persons and organizations have been given the opportunity to submit their views and recommendations concerning the re-vote.  I recommend that the Commission deny Bowers mandatory parole because he committed a serious prison rule violation when he attempted to escape from FCI Lompoc in 1979.

### Facts and Procedural History

   The relevant facts of Bowers's crime (the murder of Park Ranger Ken Patrick) and his prison record are described in the recent opinion from the U.S. Court of Appeals for the Eleventh Circuit in Bowers v. Keller, 651 F.3d 1277 (11th Cir. 2011) and will not be repeated here.  The prisoner's parole file contains a copy of the opinion.   The court of appeals determined that the Commission's voting process should return to the status of the case as of May 17, 2005, when the four voting Commissioners at the time were equally split in the decision for Bowers.  The court stated that this vote result required the prisoner's parole unless the Commission started the re-determination of the parole case within 60 days of the court's decision, and acted in accordance with applicable laws and regulations.   On October 4, 2011, the Vice Chairman and Commissioner Cushwa -- the only two Commissioners remaining from the April-May 2005 voting  -- ordered a re-vote of the case pursuant to the Commission's rule at 28 C.F.R. § 2.63(b)(3).

### Discussion

The § 4206(d) criteria are well-known to the Commissioners. Given the statutory terms, the Commission must deny parole to Bowers if it finds, by a majority vote, that any of the criteria listed disqualify Bowers for parole. If a majority vote is not reached, the statute compels the prisoner's parole. Because Chairman Fulwood has recused himself from voting in this case, the finding on a disqualifying criterion, and therefore a parole denial, must be unanimous.

*Has Bowers seriously violated prison rules?*

In deciding the substantive merits of the case, the Commission should first examine the criterion of whether Bowers has seriously violated the rules of the institution during his incarceration. In my opinion, Bowers's 1979 attempted escape was a serious violation of institution rules and disqualifies him from parole under § 4206(d) even though this crime occurred more than 30 years ago. When Justice Department attorneys raised the issue of interpreting the word "seriously" in § 4206(d) in 2005, I conducted my own research on the use of the plain language rule of statutory interpretation and the principle that a statute should not be interpreted to reach an absurd result. I concluded that the plain language of the § 4206(d) did not permit the Commission to weigh a "serious" but dated rule infraction with a subsequent satisfactory disciplinary record and then disregard the serious infraction in ordering a mandatory parole for the prisoner. For this reason I concurred with Mr. Thiessen's recommendation that the Commission deny Bowers mandatory parole in October 2005 if the Commission found that Bowers committed a serious prison rule violation by attempting to escape. In the October 2005 decision, Vice Chairman Mitchell denied Bowers mandatory parole for the sole reason that the 1979 escape attempt constituted a serious institutional rule violation. Commissioner Cushwa concurred in this finding.[1]

In the subsequent defense of the Commission's October 2005 parole denial I drafted the portion of the government's argument that advances the statutory interpretation described above. In sum, the argument is that the plain language rule of statutory interpretation should be enforced to support the finding that the word "seriously" in § 4206(d) does not allow the Commission to consider the antiquity of a particular rule violation. The antiquity of a rule violation is covered by the term "frequently" in describing those infractions that may result in a denial of parole under the statute. Each word in the statute must be given its meaning so as not to render a word, clause or phrase superfluous. The words "serious" or "seriously" convey concepts of weight, gravity and significance, not concepts of time or interludes between events. The plain language rule of statutory interpretation may yield a harsh result, but it is not the function of a federal court to rewrite the law to mitigate the severe consequences of the law.

There are anomalies that result from this interpretation of the word "seriously" in § 4206(d). For example, a prisoner may be paroled under the criteria of § 4206(a) before the two-thirds date even

---

[1] Commissioner Cushwa also found that Bowers seriously violated prison rules by sending a letter to Ranger Patrick's widow in 1990. However, in making its decision on whether Bowers has seriously violated prison rules, I recommend that the Commission not rely on the 1990 incident. The institution made no finding that this act violated prison rules. In the absence of such a finding by a discipline hearing officer, the Commission normally does not use the alleged infraction in its decision-making. Nonetheless, this incident is arguably relevant in determining whether there is a reasonable probability that Bowers would commit another crime if paroled.

though he has committed    serious escape early in his term of con    ment. To obtain parole under § 4206(a), the Commission need only determine that the prisoner has "substantially observed" prison rules, which seems to allow for weighing an extended record of good conduct against an early serious violation of prison rules and deciding that the former justifies a parole grant. Another problem is that interim hearings after the denial of mandatory parole for a serious rule violation serve little purpose if the passage of time does not remove the significance of the rule violation for the Commission's decision. These anomalies show questionable draftsmanship in the crafting of § 4206, but they do not permit either the Commission or a federal court to rewrite the statute. Under the plain language of § 4206(d), the Commission is not authorized to grant mandatory parole to Bowers if it finds that he committed a serious prison rule infraction at any time in serving his life sentence.

The Commission's acceptance of this statutory interpretation in Bowers's case does not immediately lead to a parole denial. The Commission must still decide that the attempted escape was of sufficient gravity that he must be denied release. As Bowers's attorneys pointed out in their briefing to the appellate court, the Commission has granted mandatory parole to other escapees in recent years, citing to the cases of Zvonko Busic and Sara Jane Moore. (These files are available for the Commission's review.) In past decisions the Commission has refrained from categorizing all escapes as "serious" in applying the criteria for denying mandatory parole, and I recommend that the Commission continue this practice in re-assessing whether Bowers's 1979 offense is sufficiently serious to justify a parole denial under § 4206(d). Vice Chairman Mitchell and Commissioner Cushwa are not prevented by the court's decision to reach the same conclusions they did in October 2005 on the gravity of the escape attempt. They are also free to find that, in retrospect, the findings they made in October 2005 as to the severity of the attempt are not appropriate.

In making a decision on the severity of Bowers's escape attempt, there are several factors that the Commission may weigh in the prisoner's favor. Neither Bowers nor his accomplice possessed or used a weapon in the attempt, nor did they use force against prison personnel. They did not employ the assistance of persons outside the institution to make their escape. On the other hand, there are some aggravating circumstances of Bowers's crime. He and his accomplice attempted to escape from a secure prison by climbing a perimeter fence at a time when other prisoners were in the yard. They drew gunfire from the tower when they were trapped between the inner and outer fences, with the accomplice incurring a gunshot wound. The attempt had the potential of causing considerable turmoil within the institution.

*Has Bowers frequently violated prison rules?*

At no time in 2005 did the Commission find that Bowers had frequently violated prison rules. He has a satisfactory prison conduct record since the last determination in October 2005. On the basis of the present record, there is no rational basis for a decision that Bowers must be denied mandatory parole for frequent rule violations.

*Is there a reasonable probability that Bowers would commit another crime if released?*

The remaining criterion is whether there is a reasonable probability that Bowers would commit another crime if paroled. The voting Commissioners in 2005 split on this issue. The reasons for parole denial in the October 7, 2005 notice of action included the factual basis for this finding, given the record that existed at that time. But now six years have passed since this determination. (Nine years since the last event cited by the Commission in support of the finding.) The determination of risk of recidivism arguably depends on an evaluation of dynamic, as well as static, factors. The previous reasons for parole denial referred to the prisoner's malevolent beliefs and attitudes toward the United

States Government as th.  notivation for his previous crimina.   Bowers should be given an opportunity to address this issue before the Commission makes another determination on whether he harbors such hatred for the United States Government and its officials that he poses a risk of further criminal behavior.  In 2007 Bowers waived parole consideration.  If the Commission does not find in the re-vote that Bowers has committed a serious prison rule violation, the Commission may nonetheless order a special reconsideration hearing to give Bowers the opportunity to be heard on whether his release would pose a risk of further criminal behavior.

*Letters opposing parole for the prisoner*

       After the Commission informed the widow of Ranger Patrick and other interested persons and organizations of the possible re-vote for Bowers, the Commission received the following correspondence opposing parole for the prisoner:  (1) a letter dated October 1, 2011 "   ～ (2) a letter dated October 2, 2011 from Bryant C. Watkins, a retired FBI agent; (3) a letter dated October 3, 2011 from Tomie Patrick Lee, Ranger Patrick's widow; (4) a letter dated October 10, 2011 from David Margolis of the Department of Justice; (5) a letter dated October 13, 2011 from Jonathan B. Jarvis, Director of the National Park Service; and (6) a letter dated October 14, 2011 from Chuck Canterbury, National President of the Fraternal Order of Police.  These letters largely restate previously expressed opposition to Bowers's release.

*Letter from Bowers's attorneys*

       In an October 14, 2011 letter, Bowers's attorneys object to the Commission's re-vote.  The following analysis is an earlier, and shorter, version of a draft reply I prepared for the use of the U.S. Attorney's Office in Bowers's continuing litigation in the Northern District of Georgia.  The draft is available for the Commission's review.

       The attorneys first claim that the Eleventh Circuit's order does not permit the re-vote because the order requires the Commission to return the case to the status of proceedings as of May 17, 2005, and at that time the Commission had determined that there was insufficient new adverse information to reopen the grant of mandatory parole to Bowers.  In their view, the vote in April and May 2005 was not a vote on the substantive merits of granting or denying parole to Bowers and they argue that the Commission must adhere to the mandatory parole grant issued in January 2005.  This claim is unfounded.  The court of appeals clearly gave the Commission the option of initiating new proceedings within 60 days of its order to determine whether Bowers should be granted parole, without restricting the Commission to an earlier decision.  In granting Bowers partial relief, the court stated that "we are not deciding that the Parole Commission is barred from reconsidering its May 2005 original jurisdiction decision."  The court added a footnote to this sentence noting that the Commission had revised its rules to permit a re-vote to resolve a tie vote or other impasse in making a parole decision.  Bowers v. Keller, supra, at 1296, n. 21.  The court's order required Bowers's release only if the Commission did nothing to initiate the reconsideration of the case within 60 days of the order.  The Commission has ordered a re-vote.

       The prisoner's representatives next assert that the re-vote regulation does not apply here, and that if it does apply, the regulation cannot apply retroactively to Bowers without violating the constitutional ban against ex post facto laws.  They argue that former Commissioner Spagnoli's vote against parole in April 2005 cannot be counted because of her bias toward Bowers.  Without Spagnoli's vote, the Commission vote in April-May 2005 is now 2-1 in favor of paroling Bowers.  A tie vote no longer exists and there is no basis on which to order a re-vote.  But the persuasive value of this argument depends on an event that occurred 6 years after the initial vote, i.e., the court's



determination that Spagn    iid not exercise impartial judgment i    ting on the second reopening of Bowers's case in June 2005. Using the same logic, another vote in May 2005 that favored parole for Bowers, made by former Chairman Reilly, now cannot be counted because of developments after this vote. Chairman Reilly retired from the Commission in November 2009. Of those Commissioners remaining from the April-May 2005, they are equally split in their votes on granting parole to Bowers. It is also worth noting here that the court of appeals only found that former Commissioner Spagnoli acted without impartiality in voting to reopen Bowers's case on June 14, 2005, and made no finding regarding her vote on April 19, 2005.

On the ex post facto claim, the attorneys argue that the use of the re-vote regulation creates a significant risk of prolonging Bowers's incarceration. In their view, the re-vote rule inexorably leads to a parole denial for a prisoner who is being considered for mandatory parole and whose case first results in a tie vote. But Bowers's constitutional claim depends on his ability at the time of his crime to invoke the statutory command of 18 U.S.C. § 4206(d) that he must be paroled in the absence of finding of one of the disqualifying criteria. This he cannot do because the mandatory parole statute was not in existence when he committed his murder in August 1973. Second, courts have been reluctant to apply the ex post facto prohibition to changes in commutation or parole voting procedures. E.g., Pennsylvania Prison Society v. Cortes, 622 F.3d 215, 246-47 (3rd Cir. 2010); Roller v. Gunn, 107 F.3d 227, 236-37 (4th Cir. 1997). Third, with or without the rule change at 28 C.F.R. § 2.63(b)(3), the Commission members could have agreed to a re-vote in May 2005 to resolve the tie vote. The new rule on a re-vote only sought to make the Commission's authority to choose this option "explicit." 75 FR 81458 (Dec. 28, 2010). Finally, the Commission's rules at the time Bowers committed his crime in August 1973 stated that "the Board [U.S. Board of Parole] may, on its own motion, reconsider any case prior to [the prisoner's] release and may reopen and advance, postpone, or deny a parole which has been granted." 28 C.F.R. § 2.20 (1973). This rule placed no restriction on the Board's authority to reconsider a parole grant and Bowers cannot claim that the re-vote rule somehow substantially risk an increase in his punishment.

Bowers's representatives also contend that in a re-vote the Commission is restricted to consideration of the administrative record as it existed on May 17, 2005 and may not consider any documents submitted after that date, with the possible exception of reports on new disciplinary rule violations. They argue that the Eleventh Circuit order, the re-vote rule and the Administrative Procedure Act all prohibit the Commission's use of information sent in after that date. The court order does state that the district court shall return the case to the Parole Commission "in its posture as of May 17, 2005, the date of the last Parole Commission action taken before Commissioner Spagnoli's unlawful actions." Bowers v. Keller, supra at 1295. As I advised in my September 22, 2011 memorandum, I do not believe that the court of appeals intended to freeze the administrative record as of May 17, 2005, since such an action would violate the limited standard of judicial review of agency actions that the court otherwise espoused in its opinion. The court only wanted to wind back the Commission's votes and resulting actions to a point before Commissioner Spagnoli sent her memorandum to the Justice Department recommending that the Attorney General appeal the mandatory parole grant to Bowers.

The Commission's rule on re-votes does not limit the information that may be considered at the subsequent vote. The attorneys argue that permitting the review of information sent in after May 2005 somehow converts the re-vote rule from a procedural rule (which does not require notice and comment under the APA) to a rule affecting substantive rights (which does require notice and comment). But it is hard to imagine a rule that is more associated with the internal workings and organization of an administrative agency than a rule on the voting process used by its members. Use of the procedural rule may have a significant consequence for a person, organization or segment of the general public

but that does not transfor  the rule into a substantive rule that  ...ires notice and comment in the
rulemaking process. JEM Broadcasting Co., Inc. v. FCC, 22 F.3d 320, 327 (D.C. Cir. 1994). The rule
on resolving tie votes and on re-votes did not change the substantive standards for granting or denying
parole, and this is the critical fact for determining whether the Commission was required to give notice
and allow public comment before promulgating the new rule. Id.

        The attorneys next object that the re-vote rule makes no provision for Bowers to receive
disclosure of new information submitted in the re-vote process. In most cases when a re-vote is
ordered, it is expected that little time will pass between the first and second round of votes and the
second round will be based on the same record that existed in the initial voting.  Of course, in
Bowers's case 6 years have passed since the last parole consideration so it seemed appropriate to give
Bowers's representatives and those persons opposing his parole the opportunity to again give their
views and recommendations on the parole decision.  The submissions of those persons opposing parole
largely mirror the same comments made in 2005 against releasing the prisoner.  None of the
submissions provide any new facts on the attempted escape in 1979.  We forwarded copies of the
letters to Bowers's attorneys for their comments.  We withheld one letter and portions of another to
protect the confidentiality of the submission.  The attorneys submitted responsive comments in a letter
dated November 21 along with a copy of their opposition to the government's motion to dismiss the
Georgia litigation.

        Finally, the representatives contend that if a re-vote is held, the Commission must take
"affirmative steps" to purge the taint of former Commissioner Spagnoli's actions and ensure that
Bowers's parole determination is conducted by fair and impartial decision-makers.  However, the court
of appeals did not find that the other voting Commissioners in 2005 were tainted by the actions of
former Commissioner Spagnoli and did not accept Bowers's claim that he could not receive a fair and
impartial determination from the Commission if the case were remanded to the Commission: "Finally,
contrary to Bowers' claim, we believe Bowers will receive a fair and impartial hearing if any further
action is, in fact, taken by the Parole Commission.  Commissioner Spagnoli resigned in 2007, and there
is no evidence any of the current Parole Commissioners would act outside the confines of the Parole
Act or the Parole Commission's rules and regulations." Bowers v. Keller, supra, at 1296.  The court
did not order that the Commission take any extraordinary procedural steps to isolate the former
Commissioner's analyses from the present Commissioners on a re-vote.  Nonetheless, I have removed
from the file several memoranda that Commissioner Spagnoli prepared after the initial reopening of the
case in February 2005, including her memoranda of April 19, 2005, June 1, 2005 (to the Deputy
Attorney General) and October 5, 2005.  There is no need, in my view, to disqualify from the re-voting
process any Commissioner or staff member who may have agreed with one or more of Commissioner
Spagnoli's reasons for denying Bowers parole in 2005.  This drastic step would only be justified if the
court of appeals had found that Commissioners other than Ms. Spagnoli could not exercise fair and
impartial judgment on a re-vote.

### Recommendation

        I recommend that the Commission find that Bowers committed a serious institutional rule
violation in 1979 when he attempted to escape from a secure institution.  For this reason, he should be
denied mandatory parole.  I do not recommend a finding that Bowers committed any other serious rule
infraction, or that he has frequently violated prison rules.  Finally, I recommend that the Commission
refrain from making any decision on the criterion on whether there is a reasonable probability that
Bowers would re-engage in criminal behavior if he were paroled.  A decision on this ground should
only be made after a hearing with the prisoner and affording him the opportunity to discuss his current

attitudes toward the Uni    States and its officials and any ot   r matters that are relevant to
determining the likelihood of recidivism.

Exhibit 10

Case 5:19-cv-00727-SVW-JC Document 1-13 Filed 04/24/19 Page 45 of 101 Page ID
Case 2:06-cv-02095-WCO Document 11-38 Filed 12/15/15 Page 2 of 4 Page ID
#:136





**Memorandum**

| Subject | Date |
|---|---|
| BOWERS, Veronza 35316-136 Order in <u>Bowers</u> v. Keller, No. 10-12170 (11th Cir. Aug. 26, 2011) | September 22, 2011 |
| To | From *Rockne Chickinell* |
| Vice Chairman Cranston J. Mitchell Commissioner Patricia K. Cushwa | Rockne Chickinell General Counsel U.S. Parole Commission |

### Summary

In this case, the Court of Appeals for the 11th Circuit affirmed in part, and reversed in part, the district court's denial of habeas corpus relief to petitioner Veronza Bowers. (See opinion and decision attached). Because the court found that former Commissioner Spagnoli was biased in the June 14, 2005 Commission vote to reopen Bowers's case, the court of appeals vacated the June 2005 reopening and the October 6, 2005 decision denying Bowers mandatory parole.[1] The court ordered that the parole determination proceeding should return to the status as it existed on May 17, 2005, when the votes of four Commissioners were evenly split on granting or denying Bowers mandatory parole. The court ordered that the Parole Commission "immediately review" Bowers's case to determine whether any further action for Bowers was necessary or authorized, and that if the Commission failed to initiate proceedings within 60 days, the district court grant Bowers's petition for habeas corpus and order the Commission to begin release planning and grant mandatory parole to the prisoner. I recommend that the Commission promptly review this case on the record, order and conduct a re-vote, and decide whether it should make one of the findings that would deny Bowers mandatory parole.

### Discussion

The 11th Circuit opinion describes the procedural history of this case and will not be repeated here. As of May 17, 2005, the four Commissioners who voted on Bowers's case were equally split on granting or denying him mandatory parole.[2] Vice Chairman Mitchell and former Chairman Reilly voted for mandatory parole and Commissioner Cushwa and former Commissioner Spagnoli voted to

---

[1] The court denied Bowers's request for an order granting him release without allowing the Commission the opportunity to review the case again. The court also found that there was no basis for Bowers's contention that the votes of the Commissioners other than Commissioner Spagnoli were tainted by Spagnoli's lack of impartiality.

[2] Commissioner Fulwood recused himself from voting on the case and his recusal remains in effect.

deny mandatory parole. . the Commission decides not to take . y further action in this case, the Commission will not have made a finding on one of the criteria for denying mandatory parole by a majority vote and the Commission would be required to parole Bowers by the terms of 18 U.S.C. § 4206(d). (See my memorandum dated May 13, 2005 in the file). The consequence of an unresolved tie vote in a mandatory parole case is described in the revised regulation on a Commission quorum (28 C.F.R. § 2.63, as amended by 75 FR 81457-59 (Dec. 28, 2010)). As the court of appeals recognized in its opinion at p. 44, note 21, the revised regulation provides that the Commission has the authority to re-vote to resolve a tie vote or other impasse in satisfying a voting requirement under its rules. § 2.63(b)(3).

I recommend that the two Commissioners remaining from the 2005 vote (Vice Chairman Mitchell and Commissioner Cushwa) should initiate a re-vote on whether Bowers should be granted a mandatory parole. If they initiate the re-vote, Commissioner Smoot may participate in the second round of voting.[3] The court of appeals clearly indicated that a possible parole for Bowers should be a matter for the Commission to decide, not the court. Given the circumstances that led to the court's decision to vacate the June 2005 reopening of Bowers's case, the Commission should do all it can at this juncture to ensure that the public has confidence in the decision on granting or denying parole to Bowers, whatever the result of a re-vote. A re-vote provides an opportunity to reconsider the case with the arguments presented by participating parties following the vacated reopening, and to fully explain the reasons for a parole grant or denial. I do not interpret the appellate court's order to freeze the administrative record as of May 17, 2005, and preclude the Commission from reviewing and using the briefing of relevant issues from all parties that took place in the summer and fall of 2005. Such an interpretation would be inconsistent with well-established principles of limited judicial review of administrative agency decisions, including the decisions of the Parole Commission. Bridge v. U.S. Parole Commission, 981 F.2d 97, 104-06 (3rd Cir. 1992).

Even though 6 years have passed since the 2005 vote, I would not postpone a re-vote for an examiner to conduct another hearing. Bowers has waived an interim hearing that would update the record. In the interests of finality, the Commission should make its decision on the basis of any information and arguments in the present record, with any new letters the participating parties want to send in for the Commission's review. If Bowers decides to re-apply for a hearing, we can schedule the case later for an interim hearing to comply with 18 U.S.C. § 4208(h)(2) (requiring an interim hearing every 24 months).

In conducting the re-vote, the Commission should first examine the criterion of whether Bowers has seriously violated the rules of the institution during his incarceration. In the October 2005 decision, Vice Chairman Mitchell denied Bowers mandatory parole for the sole reason that the 1979 escape attempt constituted a serious institutional rule violation. Commissioner Cushwa concurred in this finding.[4] Though the 11th Circuit vacated the October 2005 parole denial, the Commission is not

---

[3] The revised rule on a Commission quorum does not prevent Commissioner Smoot from participating in the re-vote even though she was not in office at the time of the split vote in 2005.

[4] Commissioner Cushwa also found that Bowers seriously violated prison rules by sending a letter to Ranger Patrick's widow in 1990. However, in making its decision on whether Bowers has seriously violated prison rules, I recommend that the Commission not rely on the 1990 incident. The institution made no finding that this act violated prison rules. In the absence of such a finding by a discipline hearing officer, the Commission normally does not use the alleged infraction in its decision-making. Nonetheless, this incident is arguably relevant in determining whether there is a reasonable probability that Bowers would commit another crime if paroled.

Case 5:19-cv-00727-SVW-SC Document 11 Filed 04/24/19 Page 47 of 101 Page ID
Case 2:06-cv-02095-WCO Document 138 Filed 12/15/09 Page 40 of 4 Page ID
#:138

restricted by the appell. court's decision from finding that I ers's 1979 escape attempt was a serious violation of institutional rules.[5] The court of appeals expressly withheld any opinion on the "substantive merits of the Parole Commission's October 6, 2005, decision [denying Bowers mandatory parole]." Opinion at p. 43, n.19. In considering the 1979 escape attempt, my advice is that the Commission must deny mandatory parole to Bowers if it determines that the escape attempt seriously violated prison rules, regardless of the passage of time after the incident. I concurred with this interpretation of the § 4206(d) criteria by Justice Department attorneys and former Commission attorney Doug Thiessen in 2005, and my opinion has not changed since then.[6] The Commission has not as yet promulgated a rule adopting this statutory interpretation.

If the Commission concurs with that interpretation, the remaining task is to determine the relative severity of Bowers's escape attempt when judged against other types of escape. As Bowers's attorneys pointed out in their briefing to the appellate court, the Commission has granted mandatory parole to other escapees in recent years, citing to the cases of Zvonko Busic and Sara Jane Moore. The government's brief suggested some aggravating circumstances of Bowers's escape attempt (e.g., the attempt drew gunfire from the prison tower) which arguably distinguishes his crime from other escapes. In past decisions the Commission has refrained from categorizing all escapes as "serious" in applying the criteria for denying mandatory parole, and I recommend that the Commission continue this practice in re-assessing whether Bowers's 1979 offense is sufficiently serious to justify a parole denial under § 4206(d). As noted earlier, the two Commissioners are not prevented by the court's decision to reach the same conclusions they did in October 2005 on the gravity of the escape attempt. They are also free to find that, in retrospect, the findings they made in October 2005 as to the severity of the attempt are not appropriate.

In a re-vote the Commission may also reconsider whether there is a reasonable probability that Bowers would commit another crime if released. There was no unanimity of the voting Commissioners on this point in 2005. But the criterion is open for reconsideration in a re-vote.

### Recommendation

I recommend that the Commission take the following actions to comply with the appellate court's August 26, 2011 decision: (1) Vice Chairman Mitchell and Commissioner Cushwa should order a re-vote regarding the votes they made on May 6, 2005 and April 20, 2005, respectively; and (2) if a re-vote is ordered, then the Victim-Witness Coordinator should contact Ranger Patrick's widow, Bowers and his representative, the Justice Department and all previously-interested persons and organizations notifying them of the re-vote and giving the parties 20 days to submit their views and recommendations concerning the decision for the prisoner.

---

[5] In 2005, the Commission did not find that Bowers had frequently committed prison rule violations and there is no reason to revisit this issue in the re-vote.
[6] Attorney General Holder advanced the same interpretation of § 4206(d) in opposing mandatory parole for prisoner Henry Gargano in January of this year.

Exhibit 11

*Straight Ahead*

---

**Home**

This site is hosted by the Family and Friends of Dr. Mutulu Shakur.

The next community event in honor of Dr. Mutulu Shakur is in <u>Puerto Rico</u> on April 18th. See <u>Legal Updates</u> for latest official updates on the status, email mutulushakur@hotmail.com to be added to the mailing list, or follow us on <u>Facebook</u> or <u>Twitter</u>.

## Dr. Mutulu Shakur – It is time for his release



Dr. Mutulu Shakur has been a federal prisoner since 1986. He has been denied parole eight times, has taken full responsibility for his actions, has served as a force for good and anti-violence throughout his decades of incarceration, is an elder and has multiple health complications, has a loving family that needs him, and upon release will continue to inspire people to seek self-improvement through peaceful and constructive means, as he has done while incarcerated.

The acts of which Dr. Shakur was convicted some thirty years ago were committed in the context of a movement seeking equal opportunities for black people who, it is widely conceded, were suffering catastrophically from disenfranchisement, segregation, poverty and exclusion from many of the fundamental necessities that make life worth living.

Dr. Shakur participated in civil rights, black liberation and alternative health care all as part of movements of the late 1960's to the 1980's. It was a period of civil conflict in which millions of Americans participated in social movements for justice and freedom.

In 1988 Dr. Shakur was convicted of RICO conspiracy, armed bank robbery and bank robbery killings and sentenced to 60 years in prison. At no time did the evidence show that Dr. Shakur killed anyone. At two trials the evidence indicated others were responsible for the killings (one of which became a government witness in return for a sentencing deal). The remaining defendants were acquitted for the murder allegations presented by the government. At the time Dr. Shakur was a well-known acupuncturist using his skills to address rampant drug addiction among young black people. He was a co-founder of the Republic of New Afrika movement, participated

47

in presentations to the United Nations on discrimination experienced by black communities throughout the U.S. and by 1970 was a subject of the FBI's illegal COINTELPRO infiltration program.

Dr. Shakur has accepted full responsibility for the acts that resulted in his conviction and for many years has expressed the deepest remorse for those who were killed and their families pleading that there is no justification for the loss of life for the victims. For over twenty-five years, Dr. Shakur has been a leading voice in the black community calling for peace, reconciliation and healing for the countless lives lost in pursuit of basic justice and human rights.

Dr. Shakur has for many years publicly suggested that a Truth and Reconciliation Commission ("TRC") of elected officials, faith based and community activists and experts be convened to explore racial disparities and how to seriously address these issues through a peaceful, alternative dispute mechanism utilizing democratic process.

Dr. Shakur was scheduled for mandatory release in February 2016, but was held and is currently scheduled for mandatory release on May 26, 2026. The Parole Commission most recently denied parole for the eighth time on April 20, 2016. The Parole Commission then denied Mutulu's request for reconsideration in late October 2016, and a Petition for Clemency was submitted for consideration by President Obama the same month.



The Parole Commission's denial of release is based on several faulty considerations including –

• Mutulu has not accepted responsibility for the crimes of which he was convicted. However, **Mutulu has clearly stated to the Parole Commission: "I accept full responsibility for the crimes involved in my conviction over thirty years ago. I was part of the conspiracy that resulted in those crimes and I deeply regret the loss of life involved ... I have for several decades totally rejected the use of violence."** Read more

• Mutulu often signs off his letters with the words "Stiff Resistance" and this indicates he may once again engage in violent crimes if released. **Mutulu responds that the sign off "Stiff Resistance" is intended to convey a message of resistance to injustice, discrimination, gang recruitment, etc. and is in no way intended as an incitement to anti-Government violence. It means to never give up, to be true to your beliefs, to be true to yourself even when the odds are against you.** Read more

• Mutulu has referred to himself as a "political prisoner" and this shows he is likely to commit violent crimes if released on parole. **Mutulu responds that the crimes of which he was convicted were "politically motivated," not motivated by greed or revenge. The indictment and the trial judge both acknowledge the political motivations of those charged in the indictment. It is in this sense that he has referred to himself (and others refer to him) as a political prisoner. He contends that the label of political prisoner is not mutually exclusive to either rehabilitation or reconciliation.** Read more

• Mutulu has referred to himself as a victim of the FBI's former COINTELPRO infiltration and spying program and this shows he is likely to reoffend if released. **In fact, documents released many years ago under the Freedom of Information Act show that Mutulu clearly was a victim of the COINTELPRO program and the trial judge so acknowledged in several written decisions.** <u>Read more</u>

• In 2013 Mutulu violated a prison rule by telephoning a professor who placed the call on a speaker phone so other faculty and students could listen to Mutulu's comments. **Mutulu responds that he knows of no rule that was violated by the phone call and more importantly his underlying message to the students and faculty was one of pursuing social change through peaceful means, including conflict and alternative dispute resolution.** <u>Read more</u>

Documents recently released by the Parole Commission in response to a Freedom of Information Act request show that in the past two years no other federal prisoner has been denied parole because of the types of infrequent non-serious prison rule violations Mutulu has been charged with while incarcerated for thirty years. He has had no serious rule violations in over 25 years and only four non-serious violations, none involving violence or the threat of violence.

For updates about the status of Mutulu's case or copies of his pending clemency petition or petition for reconsideration addressed to the Parole Commission, please email Peter Schey, President, Center for Human Rights and Constitutional Law, <u>pschey@centerforhumanrights.org</u> or Family and Friends of Mutulu Shakur, <u>mutulushakur@hotmail.com</u>.

## U.S. Truth and Reconciliation Commission

Dr. Shakur has not only taken responsibility for the actions for which he was convicted, but he has also become a staunch advocate for a Truth and Reconciliation Commission (also referred to as Truth and Justice Commission) to address the issue of slavery and racial injustice in the history of the United States. This is a testament to Dr. Shakur's non-violent ideology for social and political change. Dr. Shakur's main life passion now is to advocate for a Truth and Reconciliation Commission, such as the South African Model following the apartheid state, which will address the historical civil rights issues in the United States.

Worldwide, the use of Truth and Reconciliation Commissions ("TRCs") and equivalent bodies, such as truth projects, appears to be accelerating. In the last thirty years, at least thirty-two TRCs have been established in twenty-eight countries, and half of these have been launched in the last decade. TRCs are independent bodies that examine human rights violations in public forums to help communities address problems together. TRCs recommend remedies, which often include apologies and reparations.

The issues Truth and Reconciliation Commissions have addressed in the past are diverse and range from investigating disappearances, abuse of Native American children, abuses under apartheid in South Africa, crimes of Communism, and to confront past racial, cultural and religious wrongs in many countries.

Recent Truth and Reconciliation Commissions and Truth Commissions have been established in the following nations:

- Argentina (National Commission on the Disappearance of Persons, 1983)
- Bolivia (National Commission of Inquiry into Disappearances, 1982)
- Chile (National Commission for Truth and Reconciliation, 1990; National Commission on Political Imprisonment and Torture, 2003),
- Democratic Republic of Congo (Truth and Reconciliation Commission, 2003)
- Ecuador (Truth and Justice Commission, 1996; Truth Commission, 2007)
- El Salvador (Commission of Truth, 1992)
- Germany (Commission of Inquiry for the Assessment of History and Consequences of the SED Dictatorship in Germany, 1992)
- Grenada (Truth and Reconciliation Commission, 2001)
- Guatemala (Commission for the Historical Clarification of Human Rights Violations and Acts of Violence which Caused Suffering to the Guatemalan People, 1997)
- Haiti (National Commission for Truth and Justice, 1995)
- Indonesia (Truth and Reconciliation Commission, 2004)
- Liberia (Truth and Reconciliation Commission, 2005)
- Morocco (Equity and Reconciliation Commission, 2004)
- Nepal (Commission of Inquiry to Locate the Persons Disappeared during the Panchayat Period, 1990)
- Nigeria (Human Rights Violations Investigation Commission, 1999)
- Panama (Truth Commission, 2001)
- Peru (Truth and Reconciliation Commission, 2000)
- South Africa (Truth and Reconciliation Commission, 1995)
- South Korea (Truth Commission on Suspicious Deaths, 2000)
- Sri Lanka (Commission of Inquiry into Involuntary Removal and Disappearances of Persons 1994)
- Uganda (Commission of Inquiry into the Disappearance of people in Uganda, 1974 and Commission of inquiry into Violations of Human Rights, 1986)
- Uruguay (Investigative Commission on the Situation of Disappeared People and its Causes, 1985, and Peace Commission, 2000)
- Yugoslavia, Federal Republic (Truth and Reconciliation Commission, 2001)

It is well known that between five-hundred thousand and six-hundred thousand enslaved Africans were imported into mainland North America, what is today the United States. Slaves in North America were chattel, no different in law from domesticated animals or pieces of disposable property. Sociologists widely agree that up to the present time the consequences of slavery are enormous and include widespread poverty, inadequate health care, inadequately funded schools, and disproportionate unemployment in black communities.

*Traditionally, Truth and Reconciliation Commissions seek to affect positive social change using good will, understanding, healing, and compassion — the antithesis of violence or illegal means to achieve social accountability and change.*

Mutulu Shakur has joined numerous prominent academics, elected officials, law societies, and faith-based leaders proposing that a Truth and Reconciliation Commission be established to explore the roots of slavery and its impact on black communities today. Those advocating for the establishment of a Truth and Reconciliation Commission on the long-term impact of racial injustice in the United States are by definition absolutely committed to non-violent restorative justice based on the goodwill, understanding and self-reflection of people.

Dr. Shakur's transformation and message in support of restorative justice is especially compelling given his background. While serving his sentence he worked with incarcerated people and formerly incarcerated people in numerous constructive ways to address personal change and broader social change through peaceful and positive ways. He has the support of Homeboys Industries headed by Father Gregory Boyle, one of the most successful non-profit organizations in California engaged in gang intervention programs and job training and placement for formerly incarcerated youth. He has worked with formerly incarcerated people to establish programs such as the Center for Returning Citizens in Philadelphia, a program embracing and promoting family responsibility, community-based work, ethical behavior, and social consciousness for formerly incarcerated people through workshops, individual and group counseling sessions, job training and transitional housing programs. Dr. Shakur has for many years served as a mentor for the Center's Executive Director Jondhi Harrell.

In summary, for many years Dr. Mutulu Shakur has exhibited a continuum of conduct aimed at peaceful and positive personal development and social change. His transformation has been consistent and long-standing.

Views Today: 201

*Proudly powered by WordPress.*

Exhibit 12

The following exhibit contains excerpts of letters submitted to the
Parole Commission in relation to Mr. Mutulu Shakur's 2016 Parole
Hearing. These excerpts are provided for the convenience of the
Hearing Examiner and the Parole Commission. While they are part of
the Parole Commission's record the entirety of the support letter is not
attached but can be made available upon request.

## MUTULU SHAKUR, BOP #83205-012,
## EXHIBIT 1: EXCERPTS OF LETTERS OF SUPPORT SUBMITTED TO
## U.S. PAROLE COMMISSION RE APRIL 7, 2016 PAROLE HEARING

### Table of Contents

AFENI SHAKUR 3/8/16 ...................................................................................................3
SEKYIWA SHAKUR 4/3/16 ............................................................................................3
MAURICE SHELTON HARDING SHAKUR  3/30/16 ....................................................3
TYRONE CAMPBELL 4/3/16 ..........................................................................................3
JENNIFER LASKIN 3/3/16 ...............................................................................................4
SUZANNE ROSS 3/3/16 ...................................................................................................4
TOBIN PEYTON 3/3/16 ....................................................................................................5
ROYCE STOVAL 3/7/16 ...................................................................................................5
NICK NAGATANI 3/5/16 .................................................................................................6
HIRAM RIVERA 3/3/16 ....................................................................................................6
BEATRIZ BECKFORD 3/5/16 .........................................................................................6
BRIAN FRANCISCO II .....................................................................................................7
JENNA BLISS 2/28/16.......................................................................................................7
JACQUELINE GREEN 3/14/16 .......................................................................................7
LUISETTE CUEBAS 3/17/16 ...........................................................................................8
SHADIDI BEATRICE KINSEY 3/7/16 ............................................................................8
MARK SEEM 3/4/16 .........................................................................................................8
MIA DONOVAN 3/18/16...................................................................................................8
ALINA DOLAT 3/13/16 ....................................................................................................9
ASANTE LEWIS 3/7/16 ....................................................................................................9
JAMES STEWART 3/23/16 ..............................................................................................9
LATOYA COMMOCK 3/4/16 ..........................................................................................9
DENNIS CHILDS 3/12/16................................................................................................10
NOBUKO MIYAMOTO 3/18/16 ....................................................................................10
TATSUO HIRENO 3/17/16 .............................................................................................10
ERICK KHAFRE 2/28/16.................................................................................................11
SONNEE WEEDN 4/5/16 ................................................................................................11
QUINCY JONES 4/5/14 ...................................................................................................11
AKINYELE UMOJA 7/14/14 ..........................................................................................12
LINDA BARNES 7/14/14 ................................................................................................12
MAKAYA KELDAY 7/15/14 ..........................................................................................12
MARGIE NAVARRO 7/17/14 .........................................................................................12
U.S. CONGRESSMAN CHARLES RANGEL 7/21/14 ...................................................13
MIKE WATANABE 7/23/14 ............................................................................................13
DIANA BLOCK (3/17/16). ...............................................................................................13
GREGORY PICKETT (07/31/14) .....................................................................................14
DANNY GLOVER (07/29/14)...........................................................................................14
PROFESSOR KARIN STANFORD 3/11/16 ....................................................................14
JARED MORRIS 3/7/16.....................................................................................................14

## AFENI SHAKUR 3/8/16

I have known Mulutu for many years. He was the step-father of Tupac and is the father of our daughter Sekyiwa Shakur. I am fully aware of Mutulu's conviction and sentence. Since his incarceration, I am informed that Mutulu has worked tirelessly to promote education among other inmates and has participated in efforts to promote unity between prisoners from different regions, religious, ethnic and cultural affiliations. I am informed that he has mentored younger prisoners and in doing so has done his best to convince them of the importance of education, personal growth and healing. During his incarceration, he has taught other prisoners about conflict resolution by means of peaceful action and communication. He has taught a creative writing course for inmates promoting a creative outlet and a means to express themselves in a safe environment … We will be happy to cooperate closely with the Parole Officer when Mutulu is released and to keep the Parole Officer fully informed of Mutulu's job performance.

## SEKYIWA SHAKUR 4/3/16

I am Dr. Mutulu Shakur's daughter … Through all of these years, my father has maintained relationships with family, friends and colleagues outside the prison. The universal understanding among his family and friends is that upon his release, my father will dedicate himself to peaceful and entirely lawful ways to improve the lives and communities of those around him … If my father is released with supervised parole, I am ready, willing and eager to play an integral part in his reentry into society. I will provide transportation for him as needed. I will help him develop knowledge of local transportation systems and driver training if he wishes to do so. I will help with shopping, cooking, setting up an account with a financial institution, medical appointments, etc. I will facilitate family meetings and talks to ease his reintegration into our large, extended family, including his children and grandchildren, all of whom desperately look forward to being with him again. I will also be happy to cooperate fully with my father's Parole Officer and to keep him fully informed of my father's job activities and overall progress.

## MAURICE SHELTON HARDING SHAKUR  3/30/16

I am the eldest son of Dr. Mutulu … I am a veteran of the United States Army … I am forty-eight years old and work as an entertainer with over 20 years of experience in the music, film and television industries … My father and I maintain regular contact … My father has never given me the slightest indication he would re-offend if released on parole. I love him very much and, despite his lengthy incarceration, as long as I can remember he has encouraged me to be hard working, honest, kind, and to care for our family, community and country. I have always followed his advice to the best of my ability, and he is proud of me for doing so.

## TYRONE CAMPBELL 4/3/16

I am the son of Mutulu Shakur … I am employed by Good Shepherd Services in Brooklyn, NY, a nonprofit dedicated to providing at risk youth with the resources they need to thrive. My duties

include roles as a gang intervention specialist, violence awareness coordinator, afterschool coordinator, and youth mentor. I have worked in this capacity for over seven years. I have spent most of my life without knowing my biological father, Mutulu Shakur. In February 2015, my mother, Elaine Darby, finally shared with me that my biological father is Mutulu Shakur. Upon learning of this, I wrote to Mutulu and he quickly wrote back and told me he believed it was true. We immediately started communicating and I arranged to visit him and meet my half-brother Mopreme Shakur and sister Sekyiwa Shakur in California. The experience has been redemptive. I cannot begin to express in words how much love and warmth Mutulu and my half-bother and sister have shared with me. They have all opened their arms to me and welcomed me into the family. I have been blessed to be united with my father. In the two visits I've had with my father, he has embraced me with love and deep and sincere affection. He has expressed his sadness at not having been available to me for so many years. Most importantly, he has assured me of his love and support and closeness going forward. He has expressed how proud he is of the work I am doing for at-risk youth. He has shared with me his ideas about reconciliation, healing and the role of love in the ongoing struggle to help those in need.

## JENNIFER LASKIN 3/3/16

I am happy to submit this strong letter of support for the parole of Dr. Mutulu Shakur. I am the Educational Advocate with the Maryland Office of the Public Defender. Before going to law school in 2012, I was a high school teacher in northern California. I worked with at-risk and court-involved youth. In 2010 my students wrote letters to inmates of their choice. Some students chose to write to Dr. Shakur because of his relationship with the musician Tupac and based on his educational writings. Dr. Shakur wrote back to my students. But what was even better was that he had his own students write to us too. Dr. Shakur had students in the prison who were poets, musicians, and interested in history and culture. They asked my students for educational materials and poetry. They began a "pen pal" writing correspondence that lasted until I left the school to begin law school in Washington, DC. Because of Dr. Mutulu Shakur, my students were engaged in writing with a purpose and helped someone improve their life. My students gave encouraging words of advice to their pen pals and helped themselves in the process … As an Educational Advocate, I would be able to support Dr. Shakur with work-related events, presentations, and outreach to youth in order to teach the important lessons he has learned from his past wrongs.

## SUZANNE ROSS 3/3/16

I am a 77-year-old psychologist and educator and have worked in both capacities for the past 50 years and continue to do so to this day … As an educator, I taught for many years at City University in teacher training programs … I later taught at Sarah Lawrence College and at John Jay College for Criminal Justice ... It was as an educator that I met Dr. Mutulu Shakur sometime in the 1973-1974 academic year, when I was teaching a course at Lehman College on drug and alcohol abuse. I took my students to the Lincoln Hospital Detox Center to demystify drug addiction and treatment for them. Dr. Shakur gave us a tour of the facility, explained its

treatment philosophy, and provided a sophisticated sociological and psychological framework for addiction and its treatment … That same appeal and talent could surely be applied at this stage in his life, in his work with young people and particularly with Amaru Productions.

Since Dr. Shakur's incarceration, I have followed his case closely, and heard fairly regularly of his continued educational work in prison. I learned of his attempts to defuse gang activity, of his parenting of Tupac Shakur, of his mentoring in prison, including a writers' group he facilitated … I would certainly be available for any kind of psychological, medical, or other support Dr. Shakur might require should he be released. I am confident that Dr. Shakur would not engage in any violent or destructive behavior should he be released from prison but, on the contrary, be an asset to building a more constructive community, especially for our youth.

## TOBIN PEYTON 3/3/16

I have been incarcerated twice and while I have not met Dr. Shakur personally, I have been incarcerated with people who have spent time in facilities with Dr. Shakur. Every one of them spoke eloquently about Dr. Shakur and his works. His message of working within the system, self-improvement, the importance of family and essentially leading a honest and productive life has been passed on to probably hundreds of inmates and in my opinion has had a positive impact on them … His message of reconciliation, forgiveness, and love of family had a strong impact on me even though I never met Mr. Shakur and his message was delivered to me by other inmates. You must of course evaluate whether he is likely to re-offend if released but all I can add is that based on the views he holds that were shared with me when I was incarcerated, it sounds like he would be productive and law-abiding in all respects if released on parole.

## ROYCE STOVAL 3/7/16

Years ago when Dr. Shakur was held in the federal penitentiary located in Wildwood, Florida I had the opportunity to participate in a Black History program that Dr. Shakur had organized with the help of the prison staff. What I witnessed was something that I feel the world can benefit from right now. I witnessed prisoners from all different races and backgrounds working together with law enforcement. In the current political climate where there is high tension between the general public and law enforcement, people like Dr. Mutulu Shakur could play a positive role. Here you have a man long ago convicted of serious crimes against the U.S. government and law enforcement now working within the system in an effort to maintain order amongst convicted felons and correctional officers … In my opinion and from what I witnessed, he is now a fully rehabilitated individual who has dealt with his demons and youthful aggression. He has learned that the path that lead him to prison was not the right one and I am sure that he doesn't want to see anyone follow in his footsteps.

## NICK NAGATANI 3/5/16

I am a licensed attorney, and was admitted to the California State Bar in 1980. Dr Shakur was instrumental in my decision to pursue the field of law. Prior to entering law school, I was a youth counselor working with high risk Asian American Youth in the Crenshaw Community in South West Los Angeles. At this time, racial tensions and hostilities arose between African American and Asian American youth. Dr. Shakur was visiting Los Angele, and upon hearing about the racial antagonism between the ethnicities he set up a meeting with the leaders of each faction. The meeting resulted in a negotiated peace. I was very impressed with his leadership and sincere concern in restoring racial harmony in our community.

Through this encounter, I forged a friendship with Dr Shakur, and he encouraged me to continue to work with disadvantaged youth and even to consider pursuing a career in law. For the past twenty-five years I have served as an attorney supervisor in the Children's Law Center in Los Angeles. This firm represents all the children in Los Angeles County in Dependency Court proceedings ... During his lengthy incarceration, Dr Shakur continues to work with the prison youth population. He is a respected elder and he utilizes his influence to mentor, guide, and promote peace within the prison population ... I state with confidence that Dr Shakur through his actions and work in prison has demonstrated that he is a man of "peace", and will not be involved in any future violations with law enforcement.

## HIRAM RIVERA 3/3/16

I am the Executive Director of the Philadelphia Student Union (PSU). The Philadelphia Student Union is a 20 year old non-profit that exists to build the power of young people to seek a high quality education in the Philadelphia public school system ... I first became aware of Dr. Shakur and his work and legal case over twenty years ago when I was still a teenager. As an adult I began to correspond with him in the form of exchanging letters ... What most inspired me; and what I've always found relevant to my work with young people, is Dr. Shakur's commitment over the years he has been serving his sentence to providing guidance and support to people like me who are engaged with marginalized and at risk youth ... [D]uring the 30 years he has been incarcerated he ... has continued to inspire, mentor, and guide individuals such as myself towards positive means of achieving social and institutional change and has been able to adapt and apply his life lessons to the conditions and context we live in today. He is a much older man than the one who went to prison about three decades ago, and has obviously suffered serious medical issues including his stroke in 2013.  His commitment to the uplifting of society's most marginalized young people, to working within the framework of society, and the love of his family and friends, all make it highly unlikely that he would ever violate the terms of parole if released from custody.

## BEATRIZ BECKFORD 3/5/16

[I] work as an adjunct professor at a university in New York City. I know of Dr. Shakur

through my community work and reading materials over the past decade. Dr. Shakur has for many years encouraged young people to pursue an education, remain drug free, respect their elders and contribute to their communities. This is a positive message that has likely reached thousands of people and at least helped many of them to avoid criminal conduct and incarceration … I believe that given his age, his health, and the message of reconciliation he has spread for many years, it is now time to release him so that he may enjoy his elder years with his family, loved ones and community.

## BRIAN FRANCISCO II

I am a telecommunications engineer … I first heard of Dr. Mutulu Shakur through his well-known son Tupac Shakur … It is interesting to note that Tupac Shakur through his music probably reached millions of people and Dr. Shakur strongly influenced his step-son Tupac to move away from lyrics that may have encouraged young people to join gangs or engage in underworld acts and towards sharing love and understanding while remaining committed to the urgent need for social action to break down the historical effects of racial discrimination.

## JENNA BLISS 2/28/16

I am a 31-year-old artist, filmmaker and PBS documentary editor residing in New York City … I have met [Dr. Shakur's] family members and friends who have come together to rally for his release. They all echoed my impression of Dr. Shakur's unwavering generosity and enthusiasm for life.

## JACQUELINE GREEN 3/14/16

I first reached out to Dr. Mutulu Shakur in 2004 during a very difficult time in my life when I needed to consult with an expert on naturopathic cures for drug addiction … I wrote a letter to Dr. Shakur seeking guidance and support. He unexpectedly responded. He was reassuring and comforting. My mother encouraged me to keep the correspondence going, to share my father's poetry with Dr. Shakur. and to never give up on being the kind of person who the world needs. Dr. Shakur encouraged me in many ways, including to continue my education. In 2005 I earned my Associates Degree. By then I was married with two children and one on the way. In 2011 I finished my BA. Dr. Shakur encouraged me to stay on the path I was on and consistently shared his wisdom with me. He heard my voice and helped me to heal from my most troubling and difficult childhood experiences … [I]n June of 2015, he added me to his visitor's list and in August 2015 I visited him and spent a lovely afternoon celebrating his belated 65th birthday with him … In many ways he had become the father that I lost as a young girl … Given the chance. I have absolutely no doubt in Dr. Shakur's intention to make the most of his opportunity for redemption.

## LUISETTE CUEBAS 3/17/16

I am a 62 years old woman working as a Certified Nurse Midwife for 38 years … My friendship with Mr. Shakur spans over 40 years. I have been visiting with Mr. Shakur while he has been incarcerated and have seen his maturity and wisdom develop and grow over the years. Mr. Shakur has shared with me many times how he has tried to serve as a positive influence on the other prisoners by being a member of a suicide companion group, working on family education events, cultural diversity classes, being a member of a "change" group for elderly men over 50 years old, poetry events and other constructive engagements … His wisdom now sees that peaceful change within a democratic society is the only way to help the disenfranchised. He will continue to dedicate his life to helping the needy and being an advocate for human rights through peaceful means. I am certain that his return to society will be a positive reentry.

## SHADIDI BEATRICE KINSEY 3/7/16

I am a 73 year old doctor of acupuncture … holding this license for the past 24 years. In 1990, I founded and still serve as the Executive Director of P.E.A.C.E. Health Center, our mission being to bring quality and affordable healthcare to our medically underserved communities. The passion and ability to execute this mission was instilled in me by Dr. Mutulu Shakur … During his imprisonment, Dr Shakur has served his time usefully, providing mentorship to other inmates as well as always maintaining the positive attitude we have loved him for all along. This positive attitude is strongly needed for those of us who have been touched by Dr. Shakur, as well as those who have yet to meet him. I ask that he be granted parole, so that he can bring his art of healing back to the communities he served in general, but more specifically to P.E.A.C.E. Health Center, the institution his tutelage and guidance is responsible for creating.

## MARK SEEM 3/4/16

I retired some time ago from my position as CEO of the Tri-State College of Acupuncture.  Tri-State, as an institution, is in the lineage of the Lincoln Detox School of acupuncture directed from 1977 to 1979 by Dr. Mutulu Shakur … From 1977-1980 I was a student at the Lincoln Detox School of Acupuncture … I am convinced that upon his release Dr. Shakur will work with many of his colleagues and spend the last phase of his life contributing to the good of the community where he will reside.

## MIA DONOVAN 3/18/16

I am a documentary filmmaker from Montreal working with the Emmy award-winning independent film company EyeSteelFilm. I am currently developing my third feature documentary film about the Lincoln Detox Clinic … I began my personal correspondence with Dr. Shakur in December 2014 and started visiting him in December 2015 … When I think about Dr. Shakur the first thing that comes to mind is his optimism and faith in mankind, even within a prison environment. Only when I pried about how he can remain so positive did he share with me how important empathy is to him and to those he tries to mentor in prison. He told me that he

has come to believe that empathy towards others-that is understanding their viewpoint or concerns-is the key to growth and social change. Based on my personal knowledge of Dr. Shakur, I have no doubt that today he poses absolutely no threat to society and he is extremely unlikely to violate the terms of his parole … He has remained engaged with the development of Chinese medicine and acupuncture in the U.S. over the last 30 years. I believe he will easily find his way back to where he left off in terms of helping those in need recognize their full potential. His commitment to helping people of color and those who are marginalized has never faltered.

## ALINA DOLAT 3/13/16

I understand that while incarcerated Dr. Shakur has served as a role model for many young prisoners, guiding them towards education and productive future civic involvement, and away from re-offending. I respectfully urge you to now consider him for release on parole so that he may continue encouraging positive social change through peaceful and lawful means.

## ASANTE LEWIS 3/7/16

I am a 24 year entrepreneur living and working in San Francisco, California … I first heard about Dr. Shakur through friends in my community but have recently had the pleasure of meeting and getting to know several members of the Shakur family … In the past year of getting to know Dr. Shakur's daughter, Sekyiwa Shakur, and grandchildren has shown me how important it is to a family to have a father who deeply cares about his loved ones despite his long absence and incarceration. I acknowledge the conviction of Dr. Mutulu Shakur and the severity of the crimes involved cannot and should not be taken lightly. However, I have learned about his growth and change through the stories shared with me by his daughter and grandchildren.

## JAMES STEWART 3/23/16

I am familiar with Dr. Shakur's case and I worked with him during his incarceration in Pennsylvania to provide educational programming focusing on African-American history to inmates. I was impressed by the commitment and passion that Dr. Shakur brought to this effort. I was also struck by the regard other inmates had for his conflict resolution activities. I was employed as a Professor and administrator at Penn State for 29 years, retiring in 2009 … Dr. Shakur has served 30 years … He has demonstrated through his conflict resolution activities that the rehabilitation objective of incarceration has been successful. These activities and his commitment to education as a vehicle for self-improvement also indicate that Dr. Shakur is likely to be a positive force in the community upon release. He is in an ideal position to encourage youth and adults to refrain from activities that are likely to result in their eventual incarceration.

## LATOYA COMMOCK 3/4/16

I am a 36-year-old mother, nurse assistant of 14 years, community youth leader, and minister … Over the years Dr. Shakur has been a mentor to a very dear friend of mine. Over the years he has

imparted so much encouragement to her in regards to community work, family and spirituality. She calls him "Baba Shakur", a term of endearment meaning "father" in a language spoken in West Africa. Dr. Shakur is also a mentor and father figure to one of my childhood friends who was incarcerated with Dr. Shakur for several years. He also speaks highly of Dr. Shakur and the work that he has done inside of prison. He describes him as a humble man of great character who has mentored hundreds of prisoners and has helped them advance themselves through various aesthetics, such as poetry, painting, writing, music, etc. He speaks of the profound impact Dr. Shakur's cultural communications class, truth and reconciliation class, and role in resolving conflict at the request of prison administration had on him.

## DENNIS CHILDS 3/12/16

I write to you today as a concerned US citizen, a Professor of African American Literature and History at the University of California, San Diego (since 2007), and a person who believes, that, in the case of Dr. Mutulu Shakur, you have before you the chance to offer parole to a person who will serve as a tremendous community servant as a healer, teacher, and mentor … I write as someone who has been familiar with the work of Dr. Shakur since I began studying issues of social justice and the racial, class, and historical dimensions of the US Prison system as a graduate student at the University of California, Berkeley … [T]he most important thing that I would like to say along these lines is that notwithstanding the crimes for which Dr. Shakur was convicted, he has revealed himself to be … Dr. Shakur is someone who, upon release, will work at the forefront of projects having to do with alternatives to sentencing, restorative justice, drug treatment, and re-entry programs for the formerly incarcerated.

## NOBUKO MIYAMOTO 3/18/16

I am Artistic Director of Great Leap, Inc., a Los Angeles-based arts organization I founded in 1978. I have known Dr. Mutulu Shakur since the early 70s when I was living and working in New York City … I know from our personal contacts that while incarcerated he has played a constructive role participating in the initiation of programs that have helped to create harmony and creativity among fellow prisoners. His admonition to people inside and outside of prison has been to pursue rapprochement and empathy, understanding and peaceful resolution of conflicts and life's struggles. His well-known position held and espoused for over two decades, combined with a loving family ready to provide him with housing and employment, all make it highly unlikely he will ever re-offend if released on parole.

## TATSUO HIRENO 3/17/16

I assume the Parole Board has read a consistent theme about who and what this man has stood for, and listing more may not be pertinent at this time since that was not sufficient enough to help the board decide on this release … His concern and passion to quell inter-racial inmate violence, promoting personal development through group studies and creative writing to mention a few. He has done his time without incidence and deserves to be freed.

## ERICK KHAFRE 2/28/16

I mentor youth and coach youth basketball throughout the Dallas/Ft.Worth area. I am a
humanitarian and try my best to instill humane and law-abiding values in the youth I have
worked with over the years. Dr. Mutulu Shakur is my mentor and a personal friend of my family.
Our family, as well as other members of our community, believe that Dr. Shakur has for many
years while incarcerated made clear to those on the outside that our commitment to social justice
must take place with love, understanding, honesty and integrity … If Dr. Shakur is released, I am
very confident that he will contribute to efforts to help the poor by encouraging your people of
color to never give up on their schooling, to stay far away from local gangs and such groups, and
to contribute back to their communities in ways that are constructive and meaningful. He will in
no way be a threat to the public safety.

## SONNEE WEEDN 4/5/16

I have enjoyed a friendship with various members of Dr. Shakur's family for over a decade. I
count his daughter, Sekyiwa, and her mother, Afeni, as close friends, with whom I visit often. It
is through his daughter, Sekyiwa, that I met her father and have corresponded and shared
telephone visits with him for many years. More recently, I have been able to visit him in
Victorville when I travel to Southern CA. Sometimes, my adult sons, Isaiah and Simon Weedn,
have visited him with me. At those times, my sons remark about his wide-ranging topics of
conversation, from music to psychological treatment of trauma, to international law... Though
my relationship with Mutulu has not been a professional one, other than to provide materials for
resolving post traumatic stress disorder and talking about parenting issues, I can be counted on to
provide whatever sort of psychological or counseling assistance that he may need upon his
release. I will be happy to fully cooperate with his parole officer to coordinate the delivery of
these psychological or counseling services as required. I will provide these support services
without financial remuneration and for as long as needed.

## QUINCY JONES 4/5/14

Throughout my travels in the world I have witnessed first hand the transformative effects of
human compassion. The release of my dear Madiba (Nelson Mandela) from a life prison term by
then President FW de Klerk in 1990 was the single most compassionate act of the 20th Century.
This single act engaged the unification of a country suffering the ravages of apartheid to now
begin real dialogue on the Long Walk to Freedom … Madiba said "To be free is not merely to
cast off ones chains, but to live in a way that respects and enhances the freedom of others." Dr.
Shakur has dedicated his life to this same quest. Let's hold him to this task. Let's give him the
opportunity to create a new paradigm for social change. The global irreverence for his son,
Tupac, is testimonial to the message of hope and reconciliation his release portends to an entire
generation of youth. His health failing, there exists no logical rationale for continued
confinement.

## AKINYELE UMOJA 7/14/14

I served as a volunteer in the Education Department of United States Penitentiary-Atlanta from 1998 until August of 2004. In 2006 and 2007, I worked on cultural programs at the Federal Correctional Complex at Coleman, Florida (FCC Coleman). Dr. Shakur was a regular participant in both efforts. I will briefly share with you my observations of him … Dr. Shakur participated in all of these events. He is motivated by educational pursuits. His presence in the events was always positive. Shakur always encouraged other inmates to participate. He seemed to respect the opinions of others and was vocal about having an environment where a variety of prisoners; regardless of age, race, cultural background, religions, etc.; could participate … At one session several young inmates expressed remorse for their criminal activities prior to incarceration. They all credited Shakur's impact on their new thinking and behavior.

## LINDA BARNES 7/14/14

I am a Professor of Family Medicine at Boston University School of Medicine and in the Graduate Division of Religious Studies at Boston University. I have been a member of the B.U. faculty since 1999; since 2007 I have directed the Master of Science Program in Medical Anthropology and Cross-Cultural Practice … I cannot emphasize strongly enough the pivotal role Dr. Shakur's work has played in what are not only nationally applied uses of acupuncture, but also uses that have become internationally influential ... His commitment was, on one level, that of a community organizer and, more broadly, a community healer. This commitment has continued during his incarceration, through his work with fellow prisoners in promoting literacy and writing, as well as strategies of mediation aimed at reducing prisoner-on-prisoner violence …

## MAKAYA KELDAY 7/15/14

I have known Dr. Shakur since … I was born … There are … many artists … that will benefit from Dr. Shakur's presence in their lives. His unparalleled knowledge and contributions, as well as his uncompromised love of the community has inspired many young artists … I acknowledge that Dr. Shakur has been convicted of conspiracy to commit serious crimes, but my experience with him … has been one or genuine love and community building …

## MARGIE NAVARRO 7/17/14

I am an acupuncturist based in New York City … I began corresponding with Dr. Shakur as my interest in acupuncture deepened, and now that I am employed in this profession full-time I value him as a professional mentor as well as a friend … While I understand the crimes for which he was convicted are severe, he has been a steadfast positive influence in my life and I trust that he will continue to do so for many others including but not limited to aspiring health professionals. … Based on my many years of friendship and communication with him, I strongly believe that Dr. Shakur will fully abide by the terms of parole. I also believe that because of his age, his many years of good conduct in prison, and his long-standing commitment to addressing the

social injustices he still cares about through peaceful and constructive means, he should be paroled and return to his family and live out the remainder of his life alongside his children, grandchildren and the rest of us who love him and welcome his presence in our lives.

## U.S. CONGRESSMAN CHARLES RANGEL 7/21/14

I am writing … on behalf of Dr. Mutulu Shakur …As a Member of Congress and as a former Assistant United States Attorney for the Southern District of New York, 1 am quite aware of the serious nature of the crimes for which he has been incarcerated … It is my understanding that during Dr. Shakur's 28 years of incarceration, he has never engaged in illegal or violent conduct. In fact. he has served as a mentor and positive influence for young prisoners … Dr. Shakur has become a staunch advocate for a Truth and Justice Commissions, such as the South African model. Truth and Justice Commissions have a long and valuable history as a means to address major historical events that have had an adverse impact on large groups of people. As such they constitute non-violent forms of political and social change, the purpose of which is to seek justice, truth and reconciliation for the parties involved … I urge you to release Dr. Shakur on parole to enable him to be a productive member of our society. I firmly believe he will make constructive contributions to assist poor and marginalized communities wherever he resides.

## MIKE WATANABE 7/23/14

For the past thirty-nine years I have worked for the Asian American Drug Abuse Program (AADAP) in Los Angeles … Should Dr. Shakur live in the Los Angeles area following his release, AADAP will provide workforce services and connect him with social service resources to assist him in his community re-integration … I know that Dr. Shakur was convicted of very serious crimes. As with all our clients, we accept the past for what it is, and we work toward a new beginning. If he is granted this opportunity by the Members of the Parole Commission, we are ready to assist him.

## DIANA BLOCK (3/17/16)

I am a financial analyst with the University of California, San Francisco where I have worked for the past twenty years. I also am the chair of the Advisory Board of the California Coalition for Women Prisoners … I first met Dr. Shakur when he was an acupuncturist at Lincoln Hospital in the Bronx in the 1970's. I recognized that he was a skilled healer and very dedicated to justice for the community … Over the years, I have corresponded with Dr. Shakur. Despite his long sentence, he has always maintained a positive attitude … For many years Dr. Shakur has conducted himself in a dignified manner, maintaining principled relationships with other inmates and with a wide variety of people on the outside. I have every expectation that he will continue to conduct himself in this same way upon release and will in no way be a threat to public safety. The historical era has changed and he has changed since 1980's. I hope you will agree that it is time for him to come home and be reunited with his family and his community.

## GREGORY PICKETT (07/31/14)

My name is Gregory Pickett and I have worked in the field of insurance for the last four years … however my aspiration belongs to the Central Intelligence Agency of the United States of America in the capacity of a Leadership Analyst … This young man that Dr. Mutulu Shakur had taught had been through struggle, duress, sacrifice, and hard work. Not only did he succeed in his young life, but: this young man showed me a new way of learning, studying, and becoming educated. He saved me from making questionable decisions when I was so very young. The man that Mutulu taught seemed to be a natural born leader, but no leader can succeed without guidance. That young man, was [Dr. Shakir's stepson,] Mr. Tupac Shakur.

## DANNY GLOVER (07/29/14)

I have worked for many years as an actor, producer and advocate for human rights …
I am writing in support of the release on parole status of Dr. Mutulu Shakur. I am familiar with Dr. Shakur's background and the events that led to his conviction and sentencing. Nevertheless I am informed and believe that throughout his years of incarceration he has served as a mentor and teacher for many young prisoners of color, he has promoted and participated in positive and rehabilitative programs for federal prisoners, and has emerged as a leading voice calling for serious consideration of the establishment of a Truth and Reconciliation Commission to examine the roots of slavery and its consequences on society today … Committing himself for the last several years to the concept of a Truth and Reconciliation Commission, Shakur has shown that his approach to social improvement for poor people has radically changed … His contributions to society will be of a positive and constructive nature, and I am certain that he will fully comply with all aspects of his parole status.

## PROFESSOR KARIN STANFORD 3/11/16

I have visited with Dr. Shakur and he and I have communicated by telephone and correspondence. Based on our communications it is clear to me that for many years Dr. Shakur has consistently expressed views to me, his friends and family that unquestionably show his commitment to peaceful avenues for positive social change far removed from the motivation and methods alleged in his indictment and for which he was convicted some 30 years ago. Among many young African American youth and students, his message is understood to be one of reconciliation, healing and positive commitment to the communities in which they live.

## JARED MORRIS 3/7/16

I am 37 years old and work in the banking industry … [Mutulu Shakur's] work to mentor and help rehabilitate other inmates while his time in incarceration is unprecedented … Dr. Shakur has demonstrated over the past 30 years that he is not a threat to society but rather an ally to it. He has always inspired me to do the right thing and to fight for what is right even when against all odds. History will show that times are much different than they once were. This is a great country and founded on the principles of liberty and justice for all. I ask you to please give that liberty and justice to Dr. Shakur ....

Exhibit 13



**CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW**
256 SOUTH OCCIDENTAL BOULEVARD
LOS ANGELES, CA 90057
Telephone:  (213) 388-8693 ext. 310
Facsimile:  (213) 386-9484
www.centerforhumanrights.org

March 22, 2018

*Via USPS Priority Express Mail*
Mr. I. Hernandez
Disciplinary Hearing Officer
Department of Correctional Services
7338 Shoreline Drive
Stockton, CA  95219

*Re: Mutulu Shakur (# 83205-012), Incident Report 2406866, Remedy ID 740981-R6*

Dear Mr. Hernandez,

I am writing on behalf of inmate Mutulu Shakur. I understand that you handle DHO appeals in the order they are received. Mr. Shakur and I are respectfully requesting that a decision in this case be expedited *due to the impact a decision will have on Mr. Shakur's interim parole hearing scheduled for April 30, 2018.*

*The United States Parole Commission denied Mr. Shakur parole in 2016 in large part based on the 2013 telephone violation.* Should the violation be set aside before the April 30th hearing, it would likely have a major impact on the parole decision especially given the Commission's reliance on the violation in 2016. If a decision is not made before the hearing, the Commission may again deny parole because of the 2013 rule violation, and Mr. Shakur could spend another two years in prison before his next scheduled hearing even if the violation is exonerated shortly after the April 30th hearing. I am therefore respectfully requesting that you consider Mr. Shakur's appeal and notify him or us of your decision as soon as possible.

While I understand that you review these appeals in the order received, and there are far more appeals pending than resources available to deal with them, I do hope that the unique situation in this case will allow you to review this case out of order, if that's possible.

The violation involved a February 5, 2013, telephone call Mr. Shakur made to Professor Karin Stanford, who put the call on speaker phone and invited Mr. Shakur to say a few words to a group of students at California State University, Northridge. Professor Stanford was on Petitioner's approved phone call list and had visited him before this phone call. The sworn declaration of Professor Stanford that is part of the Parole Commission's record makes clear that Mr. Shakur's comments to the students were positive, non-violent, and inspiring:

I placed him on my phone speaker. He very briefly spoke about his ideas for the Truth and Reconciliation Commission, historical aspects of the civil rights movement, … the need to remember the sacrifices of civil rights workers who were killed in the woods of America, … how the people have chosen the electoral process and elected President Obama as a means to get economic, medical and political relief, and again he returned to the peaceful

68

Mr. I. Hernandez
March 22, 2018
Page 2

process for addressing healing he has long supported as a tool to resolve conflict, a process of "truth and reconciliation." …

Mr. Shakur's contribution to the event was positive and he was a voice for healing and reconciliation, which I am very glad students had the opportunity to hear. At no time did Mr. Shakur say anything that was an incitement to violence or criminality. On the opposite, his message was one of working within the system to achieve healing and reconciliation …

Mr. Shakur was charged and found guilty of violating 28 C.F.R §541.3 (297), allegedly using the telephone to circumvent the ability of staff to "monitor the call." We have actually not been able to understand how the call actually avoided monitoring as it was fully recorded and monitored. Mr. Shakur requested that the recording of the phone call be preserved for the disciplinary hearing and any appeals, but his request was denied by the DHO and the recording erased before his disciplinary hearing was conducted.

On March 13, 2013 Mr. Shakur received a DHO hearing regarding the phone incident. The presiding hearing officer was DHO Diana Elliott. DHO Elliot found Mr. Shakur guilty of 28 C.F.R §541.3 (297), phone abuse. Pursuant to BOP Policy Statement Ch. 5, Sec. 541.8(b) "A DHO may not conduct hearings without receiving specialized training and passing a certification test." However, we understand that DHO Elliott was not certified in March 2013 when she presided over Mr. Shakur's hearing. In another case, Konopka v. McGrew, 2015 U.S. Dist. LEXIS 36230 (C.D. Cal. 2015), DHO Elliott conceded in a declaration that she was not DHO certified until Oct. 2013. Referring to Elliot's declaration, the court decision states "DHO Elliott received special training and passed a certification test in October 2013 ..." Since DHO Elliott was not certified on March 13, 2013 at the time of Mr. Shakur's DHO hearing, and allowed the primary evidence to be destroyed before the hearing, you may decide that the DHO report should be expunged.

Expungement of this incident is critically important since the alleged rule violation continues to be a key reason for the Parole Commission to deny Mr. Shakur mandatory parole. Mr. Shakur's interim parole hearing is scheduled for April 30, 2018 and expunging the DHO report would have a major impact on the Parole Commission's decision. Please consider expediting this case so Mr. Shakur doesn't again serve another two years because of a rule violation that may be set aside by you shortly after the April 30, 2018, parole hearing.

Thank you for your consideration and hard work on these appeals.

Respectfully,

Peter Schey, Esq.
Counsel for Mutulu Shakur

Exhibit 14

# JOHN MATTHEW FABIAN, PSY.D., J.D., LLC
## FORENSIC & CLINICAL PSYCHOLOGICAL AREAS OF EXPERTISE

### EVALUATION OF CHILDREN, ADOLESCENTS, AND ADULTS

## CRIMINAL FORENSIC PSYCHOLOGICAL EVALUATIONS
- Competency to Stand Trial, Competency to Waive Miranda Rights/Confess
- Not Guilty by Reason of Insanity
- Mens Rea/Diminished Capacity
- Presentence Psychological Evaluations
- Conditional Release Forensic Psychological Evaluations
- Violence Risk Assessment/Assessment of Psychopathy

### ◆ Capital Litigation Forensic Psychological Evaluations
- Death Penalty Mitigation
- Competency to Waive Mitigation
- Competency to Waive Appeals
- Competency to be Executed
- Atkins Mental Retardation Evaluations
- Violence Risk Assessment at Capital Sentencing

### ◆ Sexual Offender Evaluations
- Civil Commitment of Sexual Violent Predators
- Megan's Law Sex Offender Evaluations
- Internet Pornography Forensic Psychological Evaluations
- Rape Trauma Syndrome/PTSD in Sexual Abuse Cases

### ◆ Juvenile Forensic Psychological Evaluations
- Competency to Stand Trial, Competency to Waive Miranda Rights
- Assessment of legal sanity for juveniles who are being tried in adult court
- Waiver/Bindover Evaluations
- Serious Youth Offender/Blended Sentencing Evaluations
- Juvenile Sexual Offender Evaluations
- Juvenile Presentence Psychological Evaluations
- Mens Rea/Insanity Evaluations
- Violence Risk Assessment

## CIVIL FORENSIC PSYCHOLOGICAL EVALUATIONS
- Personal Injury Examinations in Torts for Emotional Distress
- Employment Discrimination and Harassment Examinations
- Americans with Disabilities Act Evaluations
- Testamentary Capacity
- Competency to be a Witness

## DOMESTIC COURT FORENSIC PSYCHOLOGICAL EVALUATIONS
- Child Custody Evaluation
- Child Sexual Abuse/Assessment of Childhood/Adolescent Trauma

## NEUROPSYCHOLOGICAL ASSESSMENT/EVALUATION
## FITNESS FOR DUTY PSYCHOLOGICAL EVALUATIONS
## VIOLENCE IN THE WORKPLACE PSYCHOLOGICAL EXAMINATIONS

**JOHN MATTHEW FABIAN, PSY.D., J.D.**
**FORENSIC & CLINICAL PSYCHOLOGIST**

Superior Building
815 Superior Ave. Suite 2017
Cleveland, Ohio 44114
E-Mail: jfpsydjd@sbcglobal.net
Office: 216. 344. 3988
Cell:   216. 338. 6462
Fax:    216. 589. 9013
Licensed: OH, MN, IL

# CURRICULUM VITAE

## PUBLICATIONS

- Article: ***Megan's Law and Sexual Violence Risk Assessment***
  Accepted for publication by Cuyahoga County Bar Association,
  January, 2007

- Article: ***Mitigating Murder at Capital Sentencing: An Empirical and Practical Psycho-legal Strategy***
  (In Submission to University of Alabama Law Review)

- Article: ***Methamphetamine Motivated Murder: Forensic Psychological/ Psychiatric Assessment in Capital Litigation***
  (Submitting for publication- Journal of Forensic Sciences, December, 2006)

- Article: ***Trauma and Its Link To Violence***
  Accepted for publication by Centre for Crime and Justice Studies-
  Criminal Justice Matters, November, 2006

- Article: ***Can a Pedophile's Cognitive Distortions Impair His Ability To Rationally Assist with His Defense?  A Competency Case Example***
  (Publication currently in progress)

- Article: ***Rethinking "Rational" in The Dusky Standard: Assessing a High Profile Delusional Killer's Functional Abilities in the Courtroom in the Context of a Capital Murder Trial***
  Accepted for publication by Quinnipiac Law Review, September, 2006

- Article: ***Examining the Case Western Reserve University Shootings: A Look at Competency to Stand Trial From the Witness Stand***
  Cleveland Bar Journal, October, 2006

- Article: ***Current Standards and Practices in Violence Risk Assessment and Communication at a Maximum Security Forensic Hospital Following a High Profile Sexual Homicide***
  Accepted for Publication by Journal of Aggression and Violent Behavior, September, 2006

- Article:  ***A Literature Review of the Utility of Selected Violence and Sexual Violence Risk Assessment Instruments***
  Journal of Psychiatry and Law, Fall/2006

- Article: ***Forensic Psychological/ Psychiatric Evaluations in Mortgage Foreclosure Cases: A Clinical and Legal Perspective***
  Cuyahoga County Bar Association, September, 2006

- Law Review Article: ***The Risky Business of Conducting Risk Assessments For Those Already Civilly Committed As Sexually Violent Predators***
  William Mitchell School of Law, Vol. 32, No. 1, 2005

- Article: ***State Supreme Court Responses to Atkins v. Virginia: Adaptive Functioning Assessment in Light of Purposeful Planning, Premeditation, and the Behavioral Context of the Homicide***
  Journal of Forensic Psychology Practice, Vol. 6, No. 4, 2006

- Article***: Life, Death, and IQ; It's Much More Than Just A Score: The Dilemma Of The Mentally Retarded On Death Row***
  Journal of Forensic Psychology Practice, Vol. 5, No. 4, 2005

- Article: ***Psychologists as Expert Witnesses in the Courtroom: An Overview of Forensic Psychology***
  Cuyahoga County Bar Association Journal, July, 2004

- Casenote: ***Examining Our Approaches to Sex Offenders & the Law: Kansas v. Hendricks, Crane and Beyond: "Mental Abnormality," and "Sexual Dangerousness,": Volitional vs. Emotional Abnormality and the Debate Between Community Safety and Civil Liberties***
  William Mitchell School of Law-Law Review, Vol. 29, No. 4, 2003

- Article: ***Death Penalty Mitigation and the Role of the Forensic Psychologist***
  University of Alabama School of Law, Law & Psychology Review, Vol. 27, 2003

**ACADEMIC APPOINTMENT**
Cleveland State University-Department of Psychology
Adjunct Professor, Special Topics Course: *"Forensic Psychology and the Law"*
Spring, 2007

**EDUCATION**
1999-2003
Cleveland –Marshall College of Law
*Cleveland, Ohio*
J.D., Juris Doctor, conferred May 24, 2003

Landmark Case Seminar, American Psychiatry & Law Society, instructed by Phillip Resnick, M.D., forensic psychiatrist, July, 2002-April, 2003

1995-1999
Chicago School of Professional Psychology
*Chicago, Illinois*
APA Approved doctoral program in Clinical Psychology
Psy. D., Doctorate of Psychology, Conferred with Honors, August 31, 1999
Dissertation Title: "Adult Criminal Behavior and Morality: Analysis of Moral Reasoning in Offenders and Non-Offenders"

| | |
|---|---|
| 1995-1999 | Chicago School of Professional Psychology<br>*Chicago, Illinois*<br>Master of Arts, Clinical Psychology |
| 1993-1994 | University of Cincinnati<br>*Cincinnati, Ohio*<br>Master of Arts, Psychology<br>Thesis Title: "The Impact of Discipline and Supervision Practices and the Etiology of Antisocial Personality Disorder" |
| 1988-1993 | University of Cincinnati<br>*Cincinnati, Ohio*<br>Bachelor of Arts, Political Science and Psychology |

**Forensic Psychology &**
**Law Experiences**

**Forensic Psychologist**
2006-
Present

*Independent Practice- Forensic & Clinical Psychology (Multi-state practice)*
***Pretrial Forensic Psychological Evaluations***: Competency to Waive Miranda Rights, Competency to Stand Trial, Sanity, Mens Rea, Diminished Capacity
***Risk Assessment***: Sexual Violence (Megan's Law and Civil Commitment of Sexually Violent Predators, Violence Risk Assessment
***Capital Litigation***: Competency to Waive Appeals, Mitigation and Execution; Mitigation at Capital Sentencing; Mental Retardation Evaluations; Future Dangerousness
***Juvenile Forensic Psychological Evaluations***: Competency to Waive Miranda Rights, Competency to Stand Trial, Mens Rea, Waiver to Adult Court, Juvenile Sex Offender Evaluation, Juvenile Homicide
***Civil Forensic Psychological Evaluations***: Personal Injury Examinations in Torts for Emotional Distress, Assessing Employment Discrimination and Harassment Tort Claims, Disability and Workers' Compensation claims

**Consultant**
2006-Present

Neurology & Neuroscience Associates, Inc.
*Akron, Ohio*
Provide neuropsychological and clinical psychological assessments on brain injured patients.

Cuyahoga County Court of Common Pleas Juvenile Court Division
County of Cuyahoga Juvenile Diagnostic Clinic
*Cleveland, Ohio*
Consulting psychologist performing delinquency-disposition/mitigation and treatment evaluations, competency to stand trial, violence/sexual violence risk assessments, bindover/waiver to adult court evaluations.

**Forensic Psychologist**
2004-2006

State Operated Forensic Services of Minnesota at Minnesota Security Hospital
*St. Peter, Minnesota*

Provided specialized forensic evaluation services to the courts and comprehensive services to assigned Forensic Services patients. Forensic evaluations include: competency to stand trial, not guilty by reason of insanity, Commitment evaluations including Mentally Ill, Mentally Ill and Dangerous, Sexually Dangerous Persons, Sexual Psychopathic Personality. Provided expert consultation and testimony to courts and special review boards. Provided

74

technical consultation and direction to a broad spectrum of other clinicians, the courts, and community care providers in the field of forensic psychology. Provided specialized consultation to treatment teams in multiple programs serving the mentally ill, chemically dependent, developmentally disabled, and sex offender populations throughout the State Operated Forensic Services network in Minnesota.  Provided in depth evaluation and training relevant to violence and sexual violence risk assessments.

**Forensic Psychologist Consultant**
2004-2005

Federal Bureau of Prisons-Federal Correctional Institution
*Waseca, Minnesota*
Performed pre-trial forensic psychological evaluations and expert testimony for federal courts, including: competency to stand trial, not guilty by reason of insanity, and violence risk.

**Forensic  Psychologist**
Court Psychologist
1999-2004

Forensic Psychiatric Clinic of Lake County Court of Common Pleas
& Adult Probation Department
*Lake County, Ohio*
Performed pre-trial forensic psychological evaluations including:  competency to stand trial, not guilty by reason of insanity, competency to testify as a witness, and competency to waive Miranda rights.  Conducted presentence and pre-parole Sex Offender Classification (HB180) evaluations for community registration and notification pursuant to Ohio's Megan's Law. Collaborated with the sex offender registration and notification deputy officer regarding sexual offenders released into the community. Consulted with detectives regarding internet pornography cases. Performed violence risk assessments of offenders and mentally ill offenders, conditional release evaluations, presentence mitigation evaluations including psychiatric factors in the crime, psychological status, and psychiatric recommendations regarding disposition, drug and alcohol dependency mitigation evaluations, and Treatment in Lieu of Conviction sentencing evaluations.  Consulted with judges, prosecutors, defense attorneys, and probation/parole departments regarding special cases and sentencing recommendations.  Provided expert testimony for the court.
Assessed inmate crises in the jail and occasional suicide risk assessments. Provided in-service training to probation staff, attorneys, and judges.  Assessed patient psychiatric medication needs with jail psychiatrist.
*Post Doctoral Supervisors (1999):*  Sandra McPherson, Ph.D., Dee Konick, Ph.D., Todd Gates, M.D.

**Death Penalty Evaluations**

Ohio- Ohio Public Defender Commission, Ohio Attorney Generals Office common pleas court appointments, county common pleas, and court appointed defense counsel.
Evaluated defendants for death penalty mitigation, post-conviction appeal evaluations, competency to be executed, competency to waive appeals, mental retardation claims pursuant to *State of Ohio v. Lott* and *Atkins v. Virginia.*

**Consultant to Forensic Psychiatric Clinic, Public Defenders Offices,  Area Common Pleas Courts, Prosecutors' Offices, Private Defense**
2000-2004

*Forensic Psychiatric Center of Northeast Ohio, Inc., Youngstown, Ohio*
*Cuyahoga County, Ashtabula County, Ohio Public Defenders Commission*
*Portage, Geauga, Muskingham County Common Pleas Courts*
*Cuyahoga and Summit County Prosecutor's Offices*
Performed evaluations including: not guilty by reason of insanity
competency to stand trial and waive Miranda rights, Sex Offender Classification

| | |
|---|---|
| **Consulting Psychologist Juvenile Court** 2001-2004 | Cuyahoga County Court of Common Pleas Juvenile Court Division County of Cuyahoga Juvenile Diagnostic Clinic *Cleveland, Ohio* Consulting psychologist performing delinquency-disposition/mitigation and treatment evaluations, competency to stand trial, violence/sexual violence risk assessments, bindover/waiver to adult court evaluations. |

**Forensic/Clinical Psychology Intern** (Full APA Accreditation) 1998-1999

*Northwest Ohio Consortium for Internship Training in Professional Psychology Medical College of Ohio Toledo, Ohio*

Performed forensic psychological evaluations for the courts. Provided expert witness court testimony for sexual predator hearings. Evaluations included: Sex Offender Classification (HB180), violence risk assessment, competency to stand trial, not guilty by reason of insanity, presentence, presentence drug dependency, observed juvenile bindover and child custody and visitation evaluations. Conducted diagnostic assessments for sex offenders. Co-facilitated sex offender treatment groups through the Sex Offender Treatment Program (SOTP), and anger management treatment group. Conducted individual psychotherapy, psychological testing, and diagnostic assessments with clients from Division of Work Release, Lucas County Correctional Treatment Facility, Lucas County Jail, Lucas County Adult Probation Department, United States Probation/Parole, and two community mental health centers. Provided consultation services to various community agencies. Presented didactics concerning such topics as psychotherapy and sexual recidivism. Attended clinical case and staff meetings. Observed court expert witness testimony.
*Supervisor:* Jon Pansky, Ph.D., Alice Holly, Ph.D.

**Other Rotations Completed**

*Flower Rehabilitation Center*
Activities:
Conducted neuropsychological screens for neuropsychological deficits with adults who have or are suspected of having neurological damage or disease states. Identified atypical performance on neuropsychological assessment instruments and referred patients for neuropsychological evaluations. Critically reviewed neuropsychological reports and applied evaluation results in treatment issues. Participated in forensic evaluations related to neurological damage as well as consultations to the general hospital floors.

*University of Toledo Counseling Center and Student Medical Center*
Activities:
Conducted intake evaluations, individual therapy, couples therapy. Participated in staff and service meetings, case preparations, and crisis stabilization counseling. Provided diagnostic and evaluation services. Provided counseling for international psychotherapy. Provided preventative and educational functions, including seminars and workshops on sexuality, rape prevention, and consultation with various university offices.
*Supervisor:* Jean Haefner, Ph.D.

*Harbor Behavioral Healthcare*
Activities:
Co-facilitated juvenile sex offender treatment group based on cognitive/behavioral relapse prevention model.
*Supervisor:*    Bob Cooley, Ph.D.

**Student Intern**
Summer, 1998

*Cuyahoga County Prosecutors Office*
*Cleveland, Ohio*
Shadowed assistant county prosecutors and public defenders in following assignments:  Major Trial Division, Drug Unit, Child Protection Counsel (Child Sex Crimes Unit), Appeals Division, and General Legal Counsel Division.  Exposed to Mentally Disordered Offenders Program and Juvenile Justice System.

**Therapy Practicum Student**
1997-1998

*Metropolitan Correction Center*
*Federal Bureau of Prisons*
*United States Department of Justice*
*Chicago, Illinois*
Provided individual and group psychotherapy to inmates and individual treatment to sex offenders.  Performed psychological intake assessments, structured clinical interviews and assessments, substance abuse assessments for treatment, forensic screens, fitness for disciplinary hearing officers, and suicide risk assessment.  Wrote case notes, formulated treatment plans and wrote termination notes under supervision of licensed clinical psychologists.  Co-facilitated three group therapies, including:  anger management group, substance abuse group, and values group.  Attended medication clinics with staff psychologist and psychiatrist.  Attended department head staff meetings.  Attended hostage negotiation training.  Participated in panel interviews of potential employees.  Facilitated communication skills training for officers.
*Completion of 900 clinical hours.*
*Supervisors:*   Daniel Greenstein, Psy.D., John Pindelski, Ph.D.

**Diagnostic Assessment Practicum Student**
(Full APA Accreditation)
1998-1997

*Isaac Ray Center and Section on Psychiatry and Law*
*Cermak Health Services for Cook County Department of Corrections*
*Chicago, Illinois*
Activities:
Performed intelligence and personality assessments (selected, administered, scored, and interpreted psychological batteries) with male and female inmate population under supervision of licensed clinical psychologist.  Psychological evaluations included standard cognitive and personality tests in addition to forensic tests.  Conducted psychological screenings in Intensive Treatment Unit.  Provided individual therapy, facilitated and co-facilitated four structured group therapies, including:  anger management group, victimization group, self-esteem group, and values group.  Facilitated bi-weekly substance abuse support groups for dual diagnosis unit.  Attended medication clinics with psychologist and psychiatrist.  Participated in case conferences and treatment team staffings.  Attended didactics for mental health staff.  Participated in court ordered forensic evaluation at Cook County Court Psychiatric Unit.
*Completion of 788 clinical hours.*
*Supervisors:*   Carl Alaimo, Psy.D., Gary B. Kanuik, Psy.D.

| **Specialized Training** | Hare Psychopathy Checklist Revised training (Hare PCL-R) with Robert Hare, Ph.D. and Adelle Forth, Ph.D. |
| February, 2006 | *St. Paul, Minnesota* |
| | |
| March, 2000 | Hare Psychopathy Checklist Revised training with Robert Hare, Ph.D. Sex Offender Evaluation Training, Dennis Doren, Ph.D., Douglas Epperson, Ph.D., Karl Hanson, Ph.D., Vernon Quinsey *Madison, Wisconsin* |

**PRESENTATIONS**

| June 30, 2006 | 2006 Office of the State Appellate Defender of Illinois Center for Justice in Capital Proceedings at DePaul University College of Law Mitigating Madness and Sexual Deviance: 2 Capital Case Examples |
| | Consultant to PESI Healthcare Inc.  2005-2006 Seminar: *Dangerous and Sexually Violent Clients* Portland and Eugene, Oregon, March 9-10, 2006 Appleton and Brookfield, Wisconsin, November 3-4, 2005 Trumbull and Rocky Hill, Connecticut, Warwick, Rhode Island October 5-7, 2005 |
| October 27, 2005 | Testimony to Vermont House Judiciary Committee on Civil Commitment Legislation for Sexually Violent Offenders and Violent Offenders |
| October 26, 2005 | State Operated Forensic Services of Minnesota Violence and Sexual Violence Risk Assessment Training |
| June 29, 2005 | Hennepin County Bar Association, 7th Annual Civil Commitment Seminar Risk Assessment of Sexual Dangerousness |
| May 17, 2003 | Ohio Department of Rehabilitation and Correction, Adult Parole Authority Dynamic Risk Factors in Sexual Offending |
| August 11, 2003 | Court of Common Pleas, County of Lake Violence Risk Assessment of Mentally Ill Offenders |
| July, 2001 | *Ohio Association of Criminal Defense Lawyers* Treatment in Lieu of Conviction |
| December, 2000 | *Eastlake Police Department* Stalking |
| **Professional Memberships** | American Psychological Association Member Division 41 American Psychology-Law Society Member |

**References Provided Upon Request**

78

# Exhibit 15

# JOHN MATTHEW FABIAN, PSY.D., J.D., ABPP
## BOARD CERTIFIED FORENSIC & CLINICAL PSYCHOLOGIST
## FORENSIC & CLINICAL NEUROPSYCHOLOGIST

---

▪5716 W US Hwy 290, Suite 110 Austin, TX 78735 ▪North Loop 1604 East, Suite 150 San Antonio, TX 78232 ▪Telephone: 512.487.7216 ▪Fax 512-840-1980▪Email john@johnmatthewfabian.com

### FORENSIC PSYCHOLOGICAL EVALUATION
### FORENSIC NEUROPSYCHOLOGICAL EVALUATION
### PRE-PAROLE RISK ASSESSMENT

*United States of America v. Mutulu Shakur*

4/15/16

| | |
|---|---|
| **DEFENDANT:** | Mutulu Shakur (Jeral Wayne Williams) |
| **DATE OF BIRTH:** | 08/08/1950 |
| **AGE:** | 65 Years |
| **ORIGINAL CHARGES:** | Finding of Judgment RICO Conspiracy |
| | RICO Substantive Bank Robbery |
| | Armed Bank Robbery |
| | Bank Robbery Killings |
| **SENTENCE:** | 60 Years |
| **DATE OF EVALUATION:** | 03/29/2016 |

**LEGAL REFERRAL:**

Mr. Peter Schey, attorney for the Center of Human Rights and Constitutional Law, contacted me to examine his client, Mr. Mutulu Shakur, for a forensic psychological evaluation, a formal violence risk assessment, and psychological evaluation pursuant to a parole hearing in April 2016.

**STATEMENT OF NON-CONFIDENTIALITY/INFORMED CONSENT:**

Mr. Shakur was informed about the nature and purpose of the evaluation and its limits of confidentiality in front of his attorney.  He was able to understand these issues and agreed to proceed.

**SOURCES OF INFORMATION:**

1. Forensic and Clinical Interview
2. Discussion with his attorney, Mr. Schey
3. Level of Service Inventory, Revised (LSI-R)
4. Personality Assessment Inventory (PAI)
5. Inventory of Offender Risk, Needs, and Strengths (IORNS)
6. Beck Depression Inventory-II (BDI-II)
7. Static 99R
8. Hare Psychology Checklist-Revised (PCL-R)
9. U.S. Department of Justice records

10. Inmate Support Group Proposal
11. Talking Papers 03/27/2016
12. FOIA Document Excerpts
13. Appeal of Interim Parole Hearing Decision, 03/29/2005, U.S. Department of Justice
14. Various Appeal Records
15. Judgment and Probation Commitment Order, Docket Number 0031-01
16. United States District Court Pre-Sentence Report
17. Federal Initial Pre-Hearing Assessment
18. Family letters in support of parole of Mutulu Shakur

## BACKGROUND FAMILY HISTORY:

Mr. Shakur was born in Baltimore, Maryland.   His biological mother's name was Dolores Parker and his surrogate father's name was Salddine.   His parents were not married. He did not know who is biological father was.   He described Salddine as a merchant seaman.   He said his mother was blind.   He said at birth he lived with his mother until about 4 years of age.   His mother had deteriorated eyesight over time.   He said, "Me and my sister, Sharon, who was two years younger (half-sibling with the same mother), lived with my mom."   He described his mother as being in and out of the hospital and she was unable to "accompany us."   Mr. Shakur essentially said his mother was unable or incapable of raising the children- she had difficulty "accompanying us." He stated that her eyesight and blindness had severe consequences as to her ability to raise the children.   He said, "She really could not be with us most of the time.   She would have to leave us with cousins and friends up to about age 6.   I remember my uncle Johnny (grandmother's husband's brother-in-law) took us to New York and then I lived with my maternal grandmother named Ruth Lloyd.   I lived with Ruth and she was really the anchor of the family and had a lot of impact on me.   My mom would then come around and visit as well.   I always had a bed somewhere to stay."

Mr. Shakur reported that he was always loved and taken care of by family members, but he did lack a consistent upbringing by his mother because of her medical condition.   When I asked him about moving around a lot during childhood, he did acknowledge this, and then stated that this was the way it was and that he felt well taken care of.   He then stated that his father figure, Salddine, helped raise him, and there was another man, Herman, who was also a father figure in the home. He reported "some older guys like Herman would see me and connected with me."   He stated he had some father figure type of role models but never knew his biological father.   He did not share much information, thoughts, or feelings as to how his lack of biological father figure impacted his early development.

Mr. Shakur reported growing up in Queens and Jamaica area of New York.   He reported there was some poverty in different areas and he was exposed to this.   He also said he lived in the middle class areas where there were middle class black families.

I asked him again about his relationship with his mother, and he stated, "We were close.   She wanted me to grow up independently."   He stated that his mother struggled with being able to provide for her children because she was unable to work.   He said at times he would go months

without seeing his mother, but he usually saw her every few days and about twice per week.   He
said he was close with her.   He reported, "It was really a day-to-day routine that I had to learn
quick to be independent because my mother could not do everything for us a typical mother would
do.   It was really my grandmother and my mother who raised us.   My mom, at times, lived in
Baltimore and my grandmother lived in New York.   Other times, both of them lived in New York
and my mother was nearby."   He described his grandmother as being "the reinforcement, really
what you're doing day-to-day when you're young."

Mr. Shakur denied a history of any type of physical or sexual abuse.   He said, "I really was an
independent guy and had to live much of my childhood on my own.   In much of my childhood, I
lived with Ruth and then my grandfather, who was a step-grandfather named Churne.   I then had
my own apartment in high school when I was about age 16.   I was really independent.   I
remember living with my grandmother and she also raised some independence in me."

He described his mother as depressed and also blind.   She eventually received SSDI for different
medical conditions.   He described her as a very strong woman.   He stated his mother was not
involved with a number of men and he did not have step-father figures from relationships that she
had.   Some of the men who touched his life, such as Herman, were guys in the community who
knew the family and stepped in to help out.   He stated he did search for his biological father for
years but never found him.   He felt at peace with this.

Due to his independence, he stated that he lived in an apartment by himself at 16 years of age and
worked early in his life.   He said, "I had a job and got an apartment.   I was working at AAA in
maintenance, and I was self-sufficient early on.   I also worked at A&P and learned how to take
care of myself."

I asked Mr. Shakur about prior trauma.   He stated, "I've seen a lot.   Things were not as traumatic
when you have a mother that's blind.   I remember I was her seeing eye dog.   People would look
at my mom funny.   She would at times not be dressed up, she had difficulties with looking good,
she would stumble and use a cane, she would trip and fall, and she had to stand in the welfare
cheese line.   Things were different in that cheese line with a blind mother."   He stated that
instead of feeling embarrassed or ashamed, he felt proud of his mother and realized her struggles
early on.

Mr. Shakur reported again having a good connection with his biological grandparents.   He denied
a history of domestic violence with them.   He again described Ruth as his anchor in life.   He
reported no history of sexual abuse.   There was no evidence of natural disaster such as hurricanes,
floods, tornadoes, or house fires.

Mr. Shakur also witnessing other traumatic experiences.   There was violence within the streets.
He recalled one time seeing someone searched and hit in the head by the police.   The police shot
this individual in the back.   Around age 16 or 17, there was a school strike for better schools in the
Jamaica area.   Police were called in; they came in and beat some of the children.   He said, "I
remember running.   It was really unnecessary, this police violence.   There were drugs in and on
the streets.   I have seen men killed over drugs.   I've seen serious domestic violence that would

3

turn someone's stomach.   There was a lot of gang violence in the community.   I felt trapped as a person in school, and I wanted to get a good academic education.   Segregation just happened. There were also a lot of Vietnam guys coming back home addicted, and they would get involved with domestic violence, and I saw it all."

Essentially, Mr. Shakur stated that he grew up in a very political time of Vietnam and segregation. At times, he was living in more of an urban area of New York City where there was exposure to street violence and domestic violence as well as drug addiction and gang activity.   Other times he was residing in more of a black middle-class neighborhood with less exposure to these issues.

**Federal Presentence Report Background History**

The prior federal pre-sentence report indicated that Mr. Shakur had a sister named Dolores Porter who was born in Williamstown, North Carolina.   There were questions as to his biological father named Willie McCullough who was a native of North Carolina.   Shakur never knew his father as Mr. McCullough and neither resided nor maintained contact with the family.   Mr. Shakur's mother married James Porter and they produced a child, Sharon.   The mother reported this relationship was problematic due to her husband's alcoholism and they separated by 1953 when Mr. Shakur would have been about 3 years of age.   The mother suffered from glaucoma and lost her eyesight in 1954 when Mr. Shakur was about 4 years of age.   She relocated the family to Jamaica, New York, with her parents who were Reverend and Mrs. Churne Lloyd.   Ms. Porter received financial support from her parents and also worked for the Industrial Home for the Blind. She also worked as a nurse's aide in the Baltimore Hospital.

The mother described Mr. Shakur as having been an extremely sensitive and tender-hearted child in adolescence.   As he developed, he became sociable, outgoing, and made friends.   She related that he was a good student while attending Sharman Junior High School and that he graduated from Thomas Edison High School, which is a vocational school.   He was respectful to adults and attended church regularly where he was a member of the choir.   There were no significant problems in the family.   The subject and his sister were very close.   Later on, Mr. Shakur lived at home while working at the Lincoln Detoxification Center while he was in his early 20s, at which time he helped support his family.   Ms. Shakur then went to Canada to study acupuncture and subsequently established an independent residence in Manhattan, but he always maintained contact with his family.   Ms. Porter stated that she and several of her neighbors visited Mr. Shakur at the clinic for acupuncture treatments.   She found them painful, but several of her friends found relief from his treatments after conventional medical procedures had not been helpful.

She described herself as a devout Christian and that her son, Mr. Shakur, converted to Islamic faith and changed his name.   She described him as never being family and believed he had great feelings of humanity.   Therefore, she had difficulty believing that he was involved in any offenses in which he had been convicted.

Mr. Shakur's sister, Sharon Howell, was born in 1952 and is two years younger than Mr. Shakur. She reported that her father had remained with the family for about two years after she was born and the family moved to Queens and lived with her grandparents when she and the defendant were

4

children.   Her grandparents bought a house in Queens, and her mother settled the family in a quiet residential area in Queens when Mr. Shakur was about 11 years of age.   She described the family as being a close-knit family.

Afeni was also interviewed and stated she was a member of the Black Panther Party.   She and Mr. Shakur belongs to the Republic of New Africa.   She and the defendant became friends and lived together for about three years in the 1970s.   At that time, Mr. Shakur was employed at the Lincoln Detoxification Center.   They were highly compatible.   They shared a culturally rich life and informed blacks against abuse and drugs while performing similar political work.   She reported that he had been involved with grass roots advisory councils and understood political movement. He came from a real community which led to his involvement in the Republic of New Africa.   She stated that she had gravitated to the more violent Black Panther Party because she had less experience with community-based organizations as Mr. Shakur did.

While they remained good friends with basic capability, she and the defendant should never have become lovers.   They had a child names Sakyiwa Shakur, born on 10/03/1975, who had always lived with Afeni.   After their separation, Mr. Shakur was very close with his daughter and was then later a fugitive who provided financial support and was very generous to the point of over-indulging her. Their separation was caused by his relationship with Moto Ndoni who was Mr. Shakur's coworker at the Lincoln Detoxification Center.   Mr. Shakur and Ms. Ndoni produced a son, Aize, in 1974.   Although Mr. Shakur was under pressure from Ms. Ndoni to separate from Afeni, the defendant did not do so.   Mr. Shakur and Afeni lived together for a couple of years, but she was unable to accept his relationship with Ms. Ndoni, which resulted in their separation in 1976.

Churne Lloyd is Mr. Shakur's uncle.   He advised in the pre-sentencing report that he was raised in the same household as Mr. Shakur until he was about 12 years of age.   He stated the family gathered frequently.   Mr. Lloyd recalled that there were no serious conflicts and no problems in the family.   The step-grandfather named Reverend Churne Lloyd was described as having been accepting of Mr. Shakur's independent concepts.   Mr. Shakur was very close with the grandmother.   Mr. Lloyd noted that Mr. Shakur became involved in political activities as an adolescent at about age 15 or 16 with a black student group in the high school.   He volunteered to work with anti-poverty programs and joined progressive democratic clubs.   Eventually, while working with the NAACP, Mr. Shakur became frustrated with the pace of change and transitioned toward radicalism.   He recalled the defendant was always outgoing and very concerned about social issues.   Despite the nature of the severity of the criminal charges, Lloyd did not believe that Shakur was of a criminal nature.

**ACADEMIC HISTORY**:

Mr. Shakur reported attending public schools.   He attended elementary school, including three of them at PS45, PS160, and PS123.   He said he moved around a lot, depending on where his mother and grandmother lived.   He attended 142nd Junior High.   He described this as one of the worst schools in the system.   He commented, "We had 18 or 19 year olds and they were attending school with us.   There was teacher instability.   Some teachers were good and others did not really

5

84

want to be there.   We learned a lot, but it was like gang activity and pregnancy and the way of the
world rather than book learning."

He stated that he ended up in the right school eventually at Thomas Edison in Queens.   He
graduated from high school there.   He said this was a "good technical school."   He liked this
school quite a bit more so than his junior high school.   He said he was getting more politically
active by the time he left high school.   He realized the racial disparities and had seen a lot from a
young age.   He had also seen his mother be on welfare, standing in a cheese line, and struggling
with blindness.   They were very poor.   He also witnessed a lot of gang violence and criminal
activity in the streets, often spearheaded by young black men.   He always questioned the
disparities in crime, welfare, and opportunity.   He wanted to make a change in the community.

Mr. Shakur reported his high school grades were good.   He was truant for about one year.   He
would attend school for about a half day and then leave school.   He did pursue technical and
school work there.   He denied being suspended or expelled.   He reported being considered for
class president, but then ran for the treasury.   He denied any history of grade failures.   He denied
any type of special educations or behavioral placements.

Mr. Shakur was very interested in acupuncture and eventually pursued education in acupunctural
training.   He learned massage and was interested in treating drug addiction with acupuncture.
He stated that he witnessed significant drug-related violence and addiction in the street, and he
perceived that acupuncture could be a mind-body treatment for addiction.   He later on developed
research relevant to drug addiction and acupuncture and then linked acupuncture to detox
programming.   He eventually was offered opportunity to train in acupuncture in Canada and also
developed a Lincoln Hospital and Detox Center between 1970 and 1979, where he ran and worked
the facility.   He also worked at different hospitals in the acupuncture field.

**MILITARY HISTORY:**

Mr. Shakur has no military history.

**EMPLOYMENT HISTORY**:

Mr. Shakur reported working as a young male around 16 years of age.   He worked at AAA in
maintenance.   He also reported living in his own apartment around that age.   He stated that he
worked as a teacher's aide from 16 to 19 years of age.   He worked at different public schools.   He
then ran a program for HUD and was an administrator.   He opened up a Job Corps in Queens.   He
worked for the Commission for Racial Justice confronting racial issues.   As noted, he pursued
acupuncture training in Canada and received his doctorate in acupuncture.   He eventually found
the Lincoln Hospital and Detox Center.   He was actively involved in that program, blending
acupuncture with detoxing and addiction.

When asked about his activism, he stated he again had a lot of social concerns.   He said, "I was
really into the culture, and I wanted to do change.   I had a lot of friends, and I was a favorite
around town.   I was very concerned about issues, such as racial disparity, racism, and equal

opportunity."

He added that he wanted to contribute to the struggle and establish an independent nation at one time.  He said, "At that time, there were desperate times.  I was really influenced by a lot of people at that time and became part of the Black Panthers.   I believed at that time I could make a better tomorrow and had the right to do, think, and speak."

The PSR indicated that Mr. Shakur was involved in establishing a drug certification program at Lincoln Hospital in the Bronx.   He adopted the concept of treating drug addicts with acupuncture, particularly to reduce withdrawal symptoms.   He was required to practice under a research protocol through a licensed physician.   The defendant's sponsor was Richard Taft of Lincoln Hospital.   He advised that when legislation was introduced in 1975 in New York and Massachusetts establishing safeguards and standards for non-doctors to be acupuncturists and Lincoln Detoxification Program was in the forefront.   He stated that the program was attacked for political reasons by the New York City government and was shut down.   He eventually bought a building in 1979 through fundraising events and contributions and opened the Black Acupuncture Advisory Association of North America (BAAANA).   He said the clinic was not supported by an unlawful underground operation, but it was funded through affordable fees paid by the clients, tuition received from acupuncture students, and donations.   He also received training at the Quebec Association of Acupuncture in 1971 and the International Association of Acupuncture of Montreal from 1972 to 1976.   He was licensed as an acupuncturist by the State of California in 1977. He stated that BAAANA and the clinic was used as a nonprofit agency and the primary function of the center was to help the community.

During the course of the current evaluation, Mr. Shakur has continued to state that he did not kill anyone during the criminal activities that were the subject of the conviction. It  is  his position that  he  was  part of a  conspiracy  involved  in  the  robberies  and  with  the escape  from  prison  of  his  sister,  Asata  Shakur,  and  he  states  that  he  therefore  takes full  responsibility for all the  activities involved in his conviction.

**RELATIONSHIP HISTORY:**

Mr. Shakur has been legally married once to Mekini. He reported having six children, but only three of them are his biological children and the other three are not.   He said he also had a relationship with Afeni Shakur who lived in California but passed away just about a week ago.   He plans on living with his daughter Sekyiwa Shakur  if released on parole. He has family relations and maintains contact with his daughter Sekyia, his son Maurice Harding Shakur and Maurice's wife Tali del Carmen Rodriguez, and  his son Tyrone Campbell.

**MENTAL HEALTH HISTORY:**

Mr. Shakur did not believe his mother used alcohol and drugs during her pregnancy with him.   He  reported  no  evidence  of  birth  complications. Mr. Shakur  reported  no  history  of neurodevelopmental conditions, such as ADHD or learning disability.   He reported no significant childhood medical issues.   He denied a history of speech or language pathology.   He reported no

evidence of setting fires, burning property, destroying property, or hurting animals for example. He reported no significant history of fighting behaviors. He reported as a youth he did not experience any hearing, language, vision, or speech problems. He denied significant symptoms consistent with oppositional defiant disorder or conduct disorder.

During the current evaluation, Mr. Shakur reported no inpatient psychiatric treatment history. He said he may have seen a mental health professional before his instant offense, but he could not recall why and with who. He denied a history of psychiatric symptoms such as bipolar disorder and mania, depression, psychosis, delirium, PTSD, or anxiety. He reported no evidence of suicidal or homicidal ideation, plan, or intent. He has no history of self-mutilation, by report. He reported that after his son died (Tupac Shakur), "I was put in the hole and I was there for some emotional episodes. I had some fleeting suicidal thoughts." He reported his mood is usually stable. He denied problems with anger or aggression. He reported no evidence of psychosis, such as hallucinations or delusions. He reported seeking out mental health treatment through the BOP consistently throughout his prison history. I do not have any mental health records regarding this information, but he did state that he would seek out counseling and he denied every seeking out psychotropic medications.

BOP records indicate that Mr. Shakur was involved with therapy. There was no Axis I or Axis II diagnosis. He was involved with individual therapy with goals of assessing healthy mechanisms for dealing with the processing of aging, reduced feelings of environmental stress, develop a sense of wellbeing within the environment, clarify values and goals especially as they relate to family and friends, rehearse positive communication skills and improve time management skills. He expressed interest in developing insight and increase sense of connecting with others and improve the level of wellbeing within his environment through peer group affiliation.

**MEDICAL HISTORY:**

Mr. Shakur is getting older now, and he has had some medical issues. He said he had a stroke in the year 2013 or 2014. He said that he had difficulties with his right leg and right eye. He had dysarthria with evidence of speech difficulties. He denied any neurocognitive deficits after the stroke, such as problems with attention or memory. He said he had gangrene in one of his legs. He said he has esophageal stomach infection and high blood pressure, and he was recently tested at 130/76. He has had high sugar levels and currently weighs 185 pounds and stands 5 feet 9 inches tall. He has no evidence of concussions, traumatic brain injury, or seizures. He reported his sleep is good. He sleeps about 8 to 10 hours per 24-hour period. He wakes up at about 5 a.m. He stated his iron is low and he needs to rest more. He reported his appetite his good, and he denied weight gain or weight loss.

Desert Valley Hospital records in Victorville, California, indicated that Mr. Shakur had a stroke, cerebrovascular accident on 03/21/2013.

8

## SUBSTANCE USE HISTORY:

Mr. Shakur reported using marijuana and would smoke two or three puffs per day, "if it was good marijuana." He denied using marijuana all day long or smoking in large amounts or having problems controlling his use. He believed rather that he could control his uses. He said that he liked taking a couple of puffs here and there each day. He denied anyone ever telling him that the marijuana affected his life functioning.

In 1991, the Federal Bureau of Prison (BOP) noted a violation of morphine positive at Lompoc Bureau of Prisons, which he denied. He stated he never had taken any illegal drugs while serving time in the BOP. He denied ever using illegal hard drugs, such as PCP, heroin, cocaine, methamphetamine, etc., while in the community. He stated he did not like alcohol. He has used alcohol in the past, but he denied ever using it excessively or developing tolerance, withdrawals, blackouts, or having problems controlling his use. He denied a history of DUIs.

## LEGAL HISTORY:

There was a U.S. District Court, Southern District of New York, Pre-Sentence Report dated 07/28/1988 developed and written for his instant offense. He was convicted on all counts regarding RICO conspiracy, armed bank robbery, and bank robbery killings in 1988. This was a conviction by jury trial in front of Honorable Charles S. Hight. His prior criminal history includes the following information:

- 11/07/1968, age 18, grand larceny, second degree, disposition unknown. He was charged as Jeral Wayne Williams. According to King County Clerk's Office, the case was presented to the grand jury on 12/09/1968. The Supreme Court Clerk's Office in King County advised they were unable to locate a disposition for this case.

- 05/01/1970, age 19, possession of a dangerous drug, six degree, dismissed.

- 02/11/1986, age 35, racketeering conspiracy, participating in racketeering enterprise, bank robbery two counts, armed bank robbery two counts, bank robbery murder two counts, conviction.

- Pending charge, 04/07/1986, age 35, armed robbery, carrying a weapon five counts, Superior Court Essex County, New Jersey. Detainer was filed on 04/07/1986. This was an allegation that on 12/19/1978 in Livingston Township, New Jersey, Mr. Shakur and Nathan Burns, Larry Mack, and Marilyn Buck forcibly robbed in excess of $200,000 from James O'Connor. The defendants were in possession of a 0.9 mm weapon when robbing O'Connor. The defendants forcibly robbed in excess of $200,000 from Francisco Jueguen, and they were in possession of a 0.9 mm automatic weapon while perpetrating the robbery. The alleged defendants were in possession of a 0.9 mm automatic weapon on 12/19/1978, and this was a pending case.

_____

On 08/02/1988, Mr. Shakur was sentenced to U.S. District Court, Southern District of New York, to an aggregate term of 60 years.  The term was compromised of convictions for racketeering, conspiracy, participating in racketeering enterprise, bank robbery, armed bank robbery, and bank robbery involving a murder.

The pre-sentence report in 1988 indicated that Mr. Shakur had not made himself available to the probation to be interviewed and it was not possible for them to provide an assessment as to any level of the defendant's conduct, despite the comments of the subject's family, which had been recorded and noted.

The pre-sentence report overview of the government's version of the charges indicate that Mutulu Shakur and Marilyn Buck were convicted related to a relationship in a criminal enterprise organized in approximately late 1976 and continued through and beyond October 1981, including robbery and murders at Nyack and Nanuet, New York.  It was said that criminal enterprise was initially formed by Mutulu Shakur and co-racketeer Cecil Ferguson as a means of committing crime in support of black revolutionary movements in this country, as well as providing economic support for certain enterprise-affiliated organizations, such as Shakur's acupuncture clinic.  The enterprise group included primarily five black men including Mr. Shakur, Odinga, Weens, Smith, Risen, and a cooperating witness who testified at trial for the government, as well as several white women known as a secondary team.

During the period from 1976 to 1982 the enterprise planned and committed a series of crimes, including a prison breakout, armored truck robberies, and bank robberies.  The criminal spree resulted in four deaths, including the deaths of two armored car guards and two police officers as well as serious injuries to a number of others.  It was said that crimes were carefully planned and executed with precision by Mutulu Shakur and the other heavily armed black males, usually carrying an M16 automatic rifle, shotgun, and 0.9 mm handguns.  Those men were supported in the commission of their crimes with Marilyn Buck and the other secondary team members who assigned their jobs, planned escape routes, ran and drove getaway vehicles, and rented safe houses. They were aware where there criminals stored weapons and planned crimes, returning after the crimes and secreted fugitives.

This report indicated summaries of the various offenses, including an attempted robbery of an armored truck parked outside the Mellon National Bank in Pittsburgh on 12/06/1976.  That was a foiled robbery attempt with Mr. Shakur apparently being present.  He apparently fled from the robbery site on a public bus and returned to NYC.  The family then committed a series of crimes including armed robberies in a meat packing plant in the Bronx, two banks in Mount Vernon, and one back in Manhattan, and two armored trucks in New Jersey.  According to information received from the known robbery victims the total amount taken was $300,000 in six robberies.

There was another offense which included an escape from a prison, in which Mr. Shakur and others is alleged to have circled the prison in a van and provided backup security with weapons.  Some of these individuals entered the prison, along with two kidnapped prison employees, and drove out of the prison grounds in a commandeered prison van to a nearby school.

Defendant:   MUTULU SHAKUR                                                         11 of 19

_____

There were getaway cars used and eventually Chesimard traveled to Cuba where she was granted asylum. She continues to reside there and is now a teacher and well-known writer.

There was another Inwood robbery on 04/22/1981, in which the enterprise men successfully stole approximately $521,000 from a Purolato armored truck in Inwood, Long Island.  They surveyed the area in advance and carefully formulated a plan for both the robbery and the getaway.   Mr. Shakur allegedly drove a station wagon used to haul away stolen money. There were Danbury attempted robberies after the Inwood robbery. Mr. Shakur was charged with and convicted of participating in all three attempts.

There was a Bronx robbery and murder on 06/02/1981 in which about $292,000 was stolen from a Brinks truck in a shopping mall.   During that robbery, co-conspirtaor Tyrone Risen shot and killed Brinks guard William Maroney.   Another Brinks guard was seriously wounded during the gun battle surrounding the robbery.   This robbery was the group's third  attempt to  rob  an armored truck at the Boston Post Road location.

Records indicate that in approximately August 1980, the group began a series of attempts to rob a Brinks truck in Nanuet, New York.   This culminated in the 10/20/1981 robbery and murders of Brinks guard Peter Pagen and police officers Edward O'Grady and Waverly Brown.   It was Mr. Shakur who allegedly first spotted the Brinks truck and who told his criminal colleagues  that  it contained a sack so big that Santa Claus' sled could not take it away.   A co-conspirator who later testified in return for a light sentence testified that Mr. Shakur proposed that the money from this job would be split among the individual participants with no money going to the overall political activities of the group. The group eventually decided the money would be used in usual ways, including part to the individual participants and part for buying weapons, ammunition, and whatever else the enterprise needed to continue to perform its criminal acts and part for whatever projects the group wished to support.

Prior to his sentencing Mr. Shakur stated that he was not involved in the robberies or killings and that the guilty verdict was not justified by the evidence offered at trial.   He said he was guilty of being involved in a political movement that supported self-determination of black Americans. The subject insisted that he was not taking part in any offensive force as specified in the instant indictment, although he does work against counterintelligence, which made him a target of the government. He noted there was no physical evidence that connected him with the instant offense and he planned to appeal the verdict.

**INSTITUTIONAL ADJUSTMENT:**

The U.S. Department of Justice U.S. Parole Commission records indicate that information  contained in the BOP progress reported dated 07/14/2004 prepared by case manager D. Jones-Dockens, revealed the subject had satisfactory institutional adjustment.   He was working at that time 32 hours per week on laundry detail.   On 02/13/2003, he received a certificate of completion of an elder inmate psychotherapy group.   He maintained clear institutional conduct for the past 36 months.   He completed A&O program, a prerelease program prior to release.   It

should be noted that he was transferred to a number of different BOPs and he did have some incident reports.   He had one BOP incident report of contacting the public without permission in which he was found to be violating the rules of institution.   There was also a charge of phone abuse, and he was found to have violated the rules of institution.

He completed an advanced spinning exercise class, an intermediate spinning class, and was a founding member of the Coleman Penitentiary NAACP chapter.   He was involved with group psychotherapy courses and cultural diversity classes and a suicide prevention course.   He had been found to express remorse for any violence and regrets any loss of blood, whether the blood be from any racial background.

There was a finding of being drug positive on 01/14/1991, and he consistently stated he did not use drugs and this was a false reading.   His request to have his own analysis as to DNA hair sample test was denied.   He was in the program extensively while in the BOP.   He completed basic education and further education in American history, earth science, business education, and completed a wellness program in culture diversity.

An Original Jurisdiction Appeal summary indicated that the age of 57 he received the longest sentence of all the offenders, which was 60 years, and he served 22 years at that time.   There were several DHO actions noted involving inter alia telephone abuse, unauthorized contact with the public and a 27-year old positive drug test.   He received many favorable work reports, completed a changed psychotherapy group program, and participated in the elder inmate psychotherapy program, organized cultural diversity activities, completed course in victim impact, stress and anger management, suicide prevention, drug and alcohol abuse, culture diversity, and a number of education programs.

There was a recent violation through the BOP as of 02/06/2013, a phone abuse charge.   On 02/06/2013, there was a monitored previously placed phone call by Mr. Shakur.   During this phone call, Mr. Shakur solicited feedback and questions from students and answered questions posed by the call recipient acting as a moderator.   He requested to speak with Danny Glover who was in attendance.   Mr. Shakur was charged with the incident it appears because the recipient of his call, Professor Karin Standford,placed the call on her speaker phone. Mr. Shakur said he was not guilty of the charge.   It was recommended that he temporarily lose telephone privileges and email.   It is my understanding that the BOP classified this phone call as a violation because it evaded monitoring.

It is my understanding that this event was part of a black history month event in which Danny Glover visited CSUN (California State University Northridge). This event was in part organized by a professor Karin Stanford at CSUN.   She had previously visited and corresponded with Mr. Shakur.  On 02/05/2015, CSUN's department of Pan African studies, the black student union, and the Department of cinema and television arts cosponsored an event with actor and film producer Danny Glover. Mr. Shakur admits that he did call in and was a participant in what Dr. Stanford described as a symposium. Mr. Shakur called Dr. Stanford on a cell phone and she placed the call on her speaker phone for the students in the room. The phone call lasted several minutes, and they were cut off toward the end.  In her declaration which I have reviewed, Professor Standford states that nothing in Mr. Shakur's comments could be considered engaging in or encouraging group demonstration which was the initial alleged infraction that officers at USP Victorville cited him for.  When I asked Mr. Shakur currently about his involvement in this issue, he stated to me that he had met and communicated with Dr. Stanford. He stated that he had shared some of his background history with her.  He stated that she was interested in his ideas about truth and reconciliation.  He stated that they did discuss the student meeting before he participated in it and made the phone call. He stated his goal was to educate some of the students about his background history and also to continue to work toward eliminating racial disparity and to promote human rights and human equality between races.  He had no goal of inciting violence.

## CURRENT PSYCHOLOGICAL TESTING RESULTS:

Mr. Shakur was administered the Personality Assessment Inventory (PAI) to assess for psychopathology, personality, and emotional functioning.  The results on the validity scales indicate that he had a tendency to portray himself in a positive light by denying psychological and emotional problems that many people would admit to.  He was defensive on the protocol. The protocol is being interpreted with caution due to his defensiveness.  Despite his defensiveness, there is evidence of distrust, and some bitterness, potential physical signs of depression, and a lack of social support.  Clinically, Mr. Shakur reported no evidence of mental illness, such as depression, psychosis, bipolar mania, PTSD, conversion or somatic disorders, or chronic anxiety. He reported a stable positive self-image.  He reported having some stress in his life but yet some social support to help him deal with the stress.  There was no evidence of suicidality or anger problems by report.  There was no evidence of any mental disorder on the protocol.  Despite his defensiveness, it is my opinion that his clinical scales would not have been elevated.

Mr. Shakur was administered the Beck Depression Inventory-II (BDI-II) to assess for current symptoms of depression.  He scored an overall 12 on the test, which would be consistent with minimal depression and not enough evidence in my opinion to warrant a diagnosis.  He reported feeling guilty over many things he should have done.  He expects and believes he is being punished.  He is more critical of himself than he used to be.  He cries more than he used to.  He feels more restless or wound up than usual.  He has less energy than he used to have. He is more irritable than usual.  He denied symptoms related to sadness, pessimism, past failure, loss of pleasure and activities, self-dislike, suicidal thoughts, loss of interest in activities, indecisiveness, worthlessness, concentration difficulties, tiredness and fatigue, and loss of interest in sex.

**DSM 5 DIAGNOSTIC FORMULATION:**

No Diagnosis

**VIOLENCE RISK ASSESSMENT:**

I considered the Hare Psychopathy Checklist-Revised (Hare PCL-R) as an assessment of one's criminal history and personality regarding psychopathic traits.   This is a semi-structured interview and review of his file and history with assessment of a number of psychopathic and antisocial traits/tendencies.   Such personality style includes a lack of consciousness and lack of guilt, empty, egocentricity, pathological lying, repeated violation of social norms, varied and diverse criminal lifestyle, etc.   The purpose of the Hare PCL-R is to assess psychopathic personality traits and the research on the Hare PCL-R correlates psychopathy with criminality and violence.   In essence, elevated psychopathic traits are correlated with general and violent recidivism.

It is my opinion with a reasonable degree of psychological certainty that his score on the Hare PCL-R is about 7, indicating very low and no significant antisocial and psychopathic personality traits.

When reviewing the normative samples, a total score of 7 placed him in the very low psychopathic group with a T-score of 31 and 3rd percentile, which would also indicate a very low and negligible risk of recidivism of any kind.

Mr. Shakur was administered the Inventory of Offender Risk, Needs, and Strengths (IORNS), which is a self-report inventory used to assess risk issues with offenders.   The overall objective of the IORNS would be to have a self-report risk management instrument assessing as many of the variables related to criminal and violent behavior as possible and would reflect change in such variables over time or treatment.   This is a one-time analysis, however, with Mr. Shakur.   The test assesses both static and dynamic risk/need.   Static risk factors are past behavior factors that are static and unchangeable.   Dynamic risk/need factors are changeable factors, such as antisocial cognitions, values, and behaviors.   The static factors would be prior offenses for example.   Other dynamic risk issues would be criminal lifestyle variables or self-regulation problems and impulsivity for example.   Factors such as self-esteem and intimacy problems have also been related to consistent factors of recidivism for general violence and sexual offenses.   Needs issues include treatment and treatment compliance.   This test allows for consideration of protective strengths, as well, such as social supports.

The IORNS includes study samples with sample selection developed as a measure of offender recidivism risk, treatment and management needs, protective strengths, and normative comparisons to offender populations which are considered essential and of the highest relevance. Five separate offender samples were obtained for normative purposes from the New Jersey Correctional System, the Texas Department of Criminal Justice, and the Reception Unit at the Washington Correction Center for Women.   It should be noted that the instrument was not looking specifically at federal offenders who have, at times, significantly different types of

14

offenses. Therefore, the protocol will be considered with caution as, in my opinion, the risk/protective/needs factors are very similar amongst state and federal offenders, but the normative samples obviously focused on state offenders.

Mr. Shakur did not have any elevations on any of the scales. He was ultimately low in risk and high in protective strengths. There was no evidence that he was answering the questions inconsistently. There was some evidence that he was perceiving himself positively, free of serious personality flaws, which is consistent with his PAI.

The Overall Risk Index reflects three domains related to risk including static risk, dynamic risk/need, and protective strength factors. His overall score was below the 1st percentile and very low.

His Static Risk Index assessing prior criminal offenses and issues related to recidivism was not clinically significant in elevation. Under the Static Risk Index, the only area of elevation was for irresponsibility regarding prior criminal behaviors. He was not elevated for pro-criminal attitudes. There was no elevation for psychopathy or severe criminal personality. There was no clinically significant elevation for intra/interpersonal problems, alcohol/drug problems, aggression or negative social influences.

The Dynamic Need Index assessing criminal orientation and attitudes, esteem and interpersonal function problems, substance, hostility and physical aggression, as well as being influenced negative by friends or family was not clinically significant in elevation. He did report significant environmental resources. He denied negative influences by friends or family, but rather support. He did portray himself in a positive light.

When considering the overall findings on the IORNS, there was no significant evidence of elevated risk issues that are static or dynamic in nature.

Mr. Shakur's background history was also rated via the Level of Service Inventory-Revised (LSI-R), which assesses recidivism as a way of systematically bringing together risk and needs information, defender treatment planning, and for assigning levels of freedom in supervision. The LSI-R has samples of many of the major and minor risk factors in order to provide a comprehensive risk/needs assessment relevant to criminal history, companions, and attitudes/orientation which are indicators of the major risk factors identified by theory and research. It should also be noted that the full assessment of the LSI-R is challenged in this case because Mr. Shakur has been incarcerated for about 30 years. Some of the factors regarding his lifestyle once released are unknown at this time.

Overall, Mr. Shakur's score on the LSI-R was 9. When considering the profile form for male inmates, a score of 9 includes an 11.7% chance of recidivism when recidivism is designed as re-incarceration with one year following release. He presents as a low-risk/needs group. His cumulative frequency for prison inmates was 6.6%, meaning that 93-94% of the inmates would have higher scores than him.

I also considered other risk factors related to offending that the IORNS and LSI-R also consider. As part of my evaluation, I considered items in a qualitative fashion on the Federal Post-Conviction Risk Assessment. This is a scientifically based instrument developed by the administrative office of the United States Courts. The purpose is to improve the effectiveness and efficiency of post-conviction supervision. The tool is used to assess evidence-based practices as the use of a risk and needs assessment tool to identify which persons to target for correctional interventions, what characteristics and needs to address, and how to deliver supervision and treatment in a way that optimizes positive outcomes.

I considered some of the factors on this instrument. There is no evidence that he had a community supervision violation. His past criminal history included no evidence of juvenile offending. He also did not have a very variable offending pattern. His institutional adjustment has been, for the most part, positive. He did have violent offending within his current offense. He was usually employed in the community. He usually had a good work outlook. There was no evidence of alcohol or drug problems. Prior to his arrest and currently, he has good social support and a lack of family problems. He has exhibited a motivation to change, especially regarding his prior more radical militant attitudes about racial change and human rights versus the current more peaceful means to demonstrate reconciliation between races. His arrest history is not significant. His age is definitely a mitigating factor as to older age. He has maintained good educational attainment prior to his arrest with a doctorate in acupuncture, as well as consistent educational attainment within the BOP. There is no evidence of mental health problems, gambling addiction, or current criminal associates by my understanding. He has not engaged in gang activity or weapons concerns while in prison. He will have a good outlook as far as financial condition, and there is no significant evidence of life skill deficiencies, mental impairment, or low cognitive functioning.

Finally, when considering risk of violence in general criminality, I want to consider two factors, including the issue of age and social supports. One of the most significant risk factors and protective factors relevant to recidivism of any kind includes older age. Age at release from prison and older age in general has been significantly related to a diminishing and mitigating factor in risk assessment and recidivism in general. Age in crime is especially related due to differences biologically relevant to testosterone, levels of impulsivity and brain development, social and lifestyle variables, intimacy in relationships, with all findings being consistent in that youthful offenders are much higher risk of criminality than older adults. Most of the research has indicated there is a significant drop off of criminality and violence at about 40 years of age.

Other factors related to age and violence include greater access to legitimate sources of material goods and excitement, alcohol, sex, drugs; patterns of illegitimate opportunities with the assumption of adults roles and opportunity is increased for crimes, negative peer associations and lifestyles and reduced orientation to same-age and same-sex peers, and increased orientation to persons of the opposite sex or persons who are older or more mature; cognitive and analytical skills and brain development leading to a gradual decline in egocentrism and invisibility, poor decision making, and risk taking; increased legal and social costs for deviant behavior; age-graded norms, increase in maturity and responsivity; anticipation of assuming adult roles, coupled with

16

reduced subjective acceptance of deviant roles and the threat those pose in entering adult status. As individuals and offenders advance into middle and then older age, crime and violence diminish.

Importantly to this case, there is evidence of diminishing physical capabilities as one gets older, and Mr. Shakur is about 64 years of age with a history of stroke and some medical problems. Furthermore, Mr. Shakur has definite prosocial connections and relationships including his daughter and sons.   He plans on living with his daughter, Sekyiwa.   He wants to teach a class in human rights at a local community college or university.  He would also like to continue with his acupuncture work.  He has reported significant family support systems.

Importantly, there is also a significant risk factor that should be mentioned, which is the target of violence and crime.   Mr. Shakur's offenses centered around some radical and even potentially militant and violent movements that had conspired to fight racial inequality and oppression through illegal and even violent means.    Mr. Shakur's offenses included conspiracy, ultimate robbery, and bloodshed as a consequence of robbery.   Importantly, he has stated that these circumstances pertaining to Black Panther political movements, for example, have been tempered and changed over time. He reports that his co-conspirators have been released from prison and all are leading peaceful and productive lives.

Mr. Shakur has noted his attitudes and toleration for violence have changed over time. He states that the circumstances from the 1960s and 1970s have certainly changed, and the former tactics of militant response have transformed to peaceful activities that support racial equality.   It is my understanding that Mr. Shakur has not had communications with anyone about racial unrest, violence, conspiracy, etc.   He is more an advocate of equal human rights through peaceful means. He has not been involved with gang-related behaviors or the Black Guerilla family, for example. Rather, he states that he has been considered as a mentor and a peace-keeper within the prison system.   He is also reflecting upon his life and wants to be considered as a peaceful activist rather than as a convicted felon.   He wants to be a good example for the younger blacks in prison  and  is promoting reconciliation rather than violence.

**FORENSIC OPINION:**

Mr. Peter Schey, Attorney for the Center for Human Rights and Constitutional Law, is representing Mr. Shakur in his parole board hearing in April 2016.   Mr. Schey had requested I examine his client for a current forensic psychological evaluation aimed at informing the parole board as to his client's psychological status and as to a risk and violence risk assessment.

Mr. Shakur has been convicted of RICO conspiracy, federal armed bank robbery, and federal bank robbery killings in a course of criminal conduct.   He was convicted on 05/11/1988 and sentenced to 60 years in federal prison.

Under Section 2.19, information considered in making a parole/re-parole determination, the Commission can consider, under (a)(5) reports of physical, mental, or psychiatric examination of the offender.    This forensic psychological evaluation addresses Mr. Shakur's overall
17

_____

psychological status and risk.

Mr. Shakur does not present with any evidence of mental illness.  The federal BOP records indicate no diagnosis as to mental illness or personality disorder.  I have never seen him diagnosed with antisocial personality disorder.   The nature of his offending was an activist type of offense, which is a unique type of criminal offending.   Despite his racially based noble causes about 40 years ago, there was blood that was shed.   There was also indication that he was engaging in criminal enterprises and conspiracies to better his financial lifestyle.   Mr. Shakur has taken responsibility for the offending behaviors and has exhibited remorse regarding the blood that was shed as a result of the criminal endeavors.

Mr. Shakur presents as an individual who has made many reforms and changes in his life and his way of thinking and primarily his beliefs that have been modified from radical and militant perceptions of oppression and needs for equality even if through violent means to a tempered and peaceful reunification and reconciliation between races.

The factors indicating lower risk, in my opinion, include the following:

1. No significant evidence of antisocial personality disorder
2. Low psychopathic traits with a very low score of 7 on the Hare Psychopathy Checklist-Revised (PCL-R)
3. Low recidivism scores on the Level of Service Inventory, Revised (LSI-R)
4. Low recidivism scores on the Inventory of Offender Risk, Needs, and Strengths (IORNS)
5. A lack of recent violence and criminality within the BOP and good prison adjustment overall
6. Completion of various self-help programs, such as the BOP DAP program and consistent further education with college classes attended and achieved
7. A lack of prior significant criminal history and violent history prior to this instant offense
8. A lack of juvenile criminal history
9. Definite social and family supports
10. Definite positive financial situation upon leaving prison
11. Older age as a mitigating risk factor
12. Positive work outlet
13. No significant alcohol and drug issues
14. Motivation to change and a changed attitude from radical to peaceful
15. No significant mental health problems
16. A likely lack of criminal associates at his parole domicile
17. No use of weapons while in prison
18. Positive attitude toward intervention
19. Intact and high level of intelligence as a form of resilience
20. No significant life skill deficiency
21. Community and cultural situational circumstances have changed regarding past violence
22. There are significant risk management factors in place regarding his re-entry including federal probation supervision

18

Finally, it is my opinion with a reasonable degree of psychological certainty that Mr. Shakur poses as a low risk of future general and violent criminality once released into the community.

Respectfully submitted,

**John Matthew Fabian**

**_/s/ John Matthew Fabian**

_____

**e signature**
John Matthew Fabian, PSY.D., J.D., ABPP
Board Certified Forensic & Clinical Psychologist
Forensic & Clinical Neuropsychologist

19

## CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, CA 90057, in said county and state.

On April 21, 2019 I electronically filed the following document(s):

- APPENDIX 1 TO PLAINTIFFS' PETITION FOR WRIT OF HABEAS CORPUS PUSUANT TO 28 U.S.C. § 2241

with the United States District Court, Central District of California by using the CM/ECF system.

Dated: April 21, 2019

/s/*Peter Schey*
*Attorney for Plaintiffs*